**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**
**CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)**

1. **SEE NOTICE ON REVERSE**       2. **PLEASE TYPE OR PRINT**       3. **STAPLE ALL ADDITIONAL PAGES**

| Case Caption: | District Court or Agency: | Judge: |
|---|---|---|
| MICHAEL F. SALVANA, M.D., <br> Plaintiff, <br> -against- <br> NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, CARL KOENIGSMANN, M.D., JOHN MORLEY, M.D., DAVID S. DINELLO, M.D., PATRICIA HENDERSON, R.N., and BETTY M. PARKMOND, R.N., | Northern District of New Yor | Brenda K. Sannes |
| | Date the Order or Judgment Appealed from was Entered on the Docket: <br> March 6, 2025 | District Court Docket No.: <br> 109 |
| | Date the Notice of Appeal was Filed: <br> March 21, 2025 | Is this a Cross Appeal? <br> ☐ Yes  ☑ No |

| Attorney(s) for Appellant(s): <br> ☑ Plaintiff <br> ☐ Defendant | Counsel's Name: <br> Carlo A. C. de Oliveira | Address: <br> 20 Corporate Woods Blvd., Albany, NY 12211 | Telephone No.: <br> 518-449-3900 | Fax No.: <br> 518-432-3111 | E-mail: <br> cdeoliveira@ coopererving .com |
|---|---|---|---|---|---|
| Attorney(s) for Appellee(s): <br> ☐ Plaintiff <br> ☑ Defendant | Counsel's Name: <br> Jorge A. Rodriguez | Address: <br> The Capitol Albany, NY 12224 | Telephone No.: <br> 518-776-2179 | Fax No.: <br> 518-915-7754 | E-mail: <br> jorge.rodrig uez@ag.ny. gov |

| Has Transcript Been Prepared? | Approx. Number of Transcript Pages: | Number of Exhibits Appended to Transcript: | Has this matter been before this Circuit previously? ☐ Yes ☑ No <br> If Yes, provide the following: <br> Case Name: <br> 2d Cir. Docket No.:        Reporter Citation: (i.e., F.3d or Fed. App.) |
|---|---|---|---|

*ADDENDUM "A"*:  COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

*ADDENDUM "B"*:  COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

**PART A:  JURISDICTION**

| 1. Federal Jurisdiction | | 2. Appellate Jurisdiction | |
|---|---|---|---|
| ☐ U.S. a party | ☐ Diversity | ☑ Final Decision | ☐ Order Certified by District Judge (i.e., Fed . R. Civ. P. 54(b)) |
| ☐ Federal question (U.S. not a party) | ☐ Other (specify) | ☐ Interlocutory Decision Appealable As of Right | ☐ Other (specify): _____ |

**IMPORTANT.  COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

**FORM C** (Rev. October 2016)

## PART B: DISTRICT COURT DISPOSITION (Check as many as apply)

**1. Stage of Proceedings**

- [✓] Pre-trial
- [ ] During trial
- [ ] After trial

**2. Type of Judgment/Order Appealed**

- [ ] Default judgment
- [ ] Dismissal/FRCP 12(b)(1) lack of subject matter juris.
- [✓] Dismissal/FRCP 12(b)(6) failure to state a claim
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) frivolous complaint
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) other dismissal

- [ ] Dismissal/other jurisdiction
- [ ] Dismissal/merit
- [ ] Judgment / Decision of the Court
- [✓] Summary judgment
- [ ] Declaratory judgment
- [ ] Jury verdict
- [ ] Judgment NOV
- [ ] Directed verdict
- [ ] Other (specify):

**3. Relief**

- [ ] Damages:
  - [ ] Sought: $ _____
  - [ ] Granted: $ _____
  - [ ] Denied: $ _____
- [ ] Injunctions:
  - [ ] Preliminary
  - [ ] Permanent
  - [ ] Denied

## PART C: NATURE OF SUIT (Check as many as apply)

**1. Federal Statutes**

- [ ] Antitrust
- [ ] Bankruptcy
- [ ] Banks/Banking
- [✓] Civil Rights
- [ ] Commerce
- [ ] Energy
- [ ] Commodities
- [ ] Other (specify): _____
- [ ] Communications
- [ ] Consumer Protection
- [ ] Copyright ☐ Patent
- [ ] Trademark
- [ ] Election
- [ ] Soc. Security
- [ ] Environmental
- [ ] Freedom of Information Act
- [ ] Immigration
- [ ] Labor
- [ ] OSHA
- [ ] Securities
- [ ] Tax

**2. Torts**

- [ ] Admiralty/ Maritime
- [ ] Assault / Defamation
- [ ] FELA
- [ ] Products Liability
- [ ] Other (Specify):

**3. Contracts**

- [ ] Admiralty/ Maritime
- [ ] Arbitration
- [ ] Commercial
- [ ] Employment
- [ ] Insurance
- [ ] Negotiable Instruments
- [ ] Other Specify

**4. Prisoner Petitions**

- [ ] Civil Rights
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Parole
- [ ] Vacate Sentence
- [ ] Other

**5. Other**

- [ ] Hague Int'l Child Custody Conv.
- [ ] Forfeiture/Penalty
- [ ] Real Property
- [ ] Treaty (specify): _____
- [ ] Other (specify): _____

**6. General**

- [ ] Arbitration
- [ ] Attorney Disqualification
- [ ] Class Action
- [ ] Counsel Fees
- [ ] Shareholder Derivative
- [ ] Transfer

**7. Will appeal raise constitutional issue(s)?**

- [✓] Yes
- [ ] No

Will appeal raise a matter of first impression?

- [ ] Yes
- [✓] No

---

1. Is any matter relative to this appeal still pending below? [ ] Yes, specify: _____ [✓] No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

   (A) Arises from substantially the same case or controversy as this appeal? [ ] Yes [✓] No

   (B) Involves an issue that is substantially similar or related to an issue in this appeal? [ ] Yes [✓] No

If yes, state whether ☐ "A," or ☐ "B," or ☐ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: | Docket No. | Citation: | Court or Agency: |
|---|---|---|---|
| Name of Appellant: | | | |
| Date: April 4, 2025 | Signature of Counsel of Record: | | |

## NOTICE TO COUNSEL

Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.
2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.
3. Pay the $505 docketing fee to the United States District Court or the $500 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE LOCAL RULE 12.1.*

FORM C (Rev. December 2016)

Addendum A

## ADDENDUM A

## FORM C – Michael Salvana M.D. v. John Morley, M.D., at al

Nature of the Action

Plaintiff Michael Salvana M.D. was a clinical physician employed by the New York State Department of Corrections and Community Supervision ("DOCCS") at the Walsh Regional Medical Unit within the Mohawk Correctional Facility. The Walsh RMU housed inmates with the most complicated health related issues with the New York correctional facility. Dr. Salvana was the facility director responsible to oversee all medical staff in in the prison hospital.

In 2017, DOCCS implemented the Medications With Abuse Potential ("MWAP"), which required physicians to request pre-approval to prescribe medications from individuals not directly involved the treatment of the patient. Dr. Salvana opposed the MWAP Policy because it violated medical standards and quality of care requirements, lead to inhumane, cruel, and medically negligent treatment because it allowed the individually tailored medical judgment of treating physicians to be supplanted by administrators who did not treat the patient. Dr. Salvana protested the implementation and enforcement of the MWAP Policy with his direct supervisor and to multiple colleagues and DOCCS officials not within his direct chain of command. In 2021, the MWAP policy was rescinded by DOCCS after it was fond that patients were denied treatment as a result of the MWAP.

Based on his protest of this misguided, harmful policy, Dr. Salvana was threatened, harassed, and retaliated against, resulting in his involuntary retirement from state employment. While other doctors raised concerns about the MWAP policy, no other doctor was adversely affected by their speech as Dr. Salvana was. Dr. Salvana was removed from Walsh RMU, offered a part-time physician position, and denied the opportunity to transfer to a position for which he was qualified based on his seniority status.

The Result Below

The District Court granted defendants' motion to dismiss Dr. Salvana's Equal Protection claim on the grounds that Dr. Salvana's claim was duplicative of his First Amendment claim. The District Court perceived the Supreme Court's ruling in *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) as eliminating all class-of-one Equal Protection claims in the public employer context. Such finding is inconsistent with the Second Circuit's decision in *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019).

The District Court dismissed Dr. Salvana's claims against DOCCS on Eleventh Amendment grounds. However, reinstatement is a prospective injunctive relief that may be ordered against governmental employees sued in their official capacities under *Ex Parte Young* exception to the Eleventh Amendment's sovereign immunity bar.

The District Court granted summary judgment to the defendants finding that Dr. Salvana's criticism of the MWAP policy was within the scope of his duties. However, the District Court misapplied *Weintraub v. Bd. Of Educ. Of City School Dist. of City of N.Y.*, because Dr. Salvana's complaints about DOCCS policy was not part-and-parcel of his everyday job duties as explained by the Second Circuit in *Montero v. City of Yonkers*, 890 F.3d 386 (2nd Cir. 2018). In *Montero v. City of Yonkers*, the Second Circuit held that speech is protected is the speech is not "ordinarily within the scope of an employee's duties ... or part of the practical reality of this everyday work." 890 F.3d 386, 395-396 (2nd Cir. 2018).

The following are annexed hereto as Addendum A

1. Notice of Appeal
2. The District Court Docket Sheet
3. The Decision of the District Court dated 8/10/2022 (Dkt. No. 26)
4. The Decision of the District Court dated 3/6/2025 (Dkt. No. 108)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL F. SALVANA, M.D.,

                      Plaintiffs,

         -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, CARL KOENIGSMANN,
M.D., JOHN MORLEY, M.D., DAVID S.
DINELLO, M.D., PATRICIA HENDERSON,
R.N., and BETTY M. PARKMOND, R.N.,

                      Defendants.

**Notice of Appeal**

**5:21-cv-00735
(BKS/ML)**

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that plaintiff hereby appeals to the United States Court of

Appeals for the Second Circuit, from each and every part of the Memorandum Decision and Order

and Judgment in this action dated and entered March 6, 2025 which denied Plaintiffs' Motion for

Summary Judgment and Dismissed the Case.

Dated: March 21, 2025
      Albany, New York

COOPER ERVING & SAVAGE, LLP

By:                           

        Carlo A. C. de Oliveira
        Attorneys for Plaintiff
        20 Corporate Woods Blvd.
        Albany, NY 12207
        (518)449-3900

APPEAL,CLOSED

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.8 (Revision 1.8.3)] (Syracuse)
# CIVIL DOCKET FOR CASE #: 5:21-cv-00735-BKS-ML

Salvana v. New York State Department of Corrections and Community Supervision et al
Assigned to: Chief Judge Brenda K. Sannes
Referred to: Magistrate Judge Miroslav Lovric
Cause: 42:1983 Civil Rights Act

Date Filed: 06/28/2021
Date Terminated: 03/06/2025
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Michael F. Salvana, M.D.**                    represented by **Carlo Alexandre C. de Oliveira**
Cooper Erving & Savage LLP
20 Corporate Woods Boulevard - Suite 501
Albany, NY 12211
518-449-3900
Fax: 518-432-3111
Email: cdeoliveira@coopererving.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrea Forsee**
Mehri & Skalet, PLLC
2000 K Street NW, Suite 325
Washington, DC 20006
202-822-5100
Email: aforsee@findjustice.com
*ATTORNEY TO BE NOTICED*

**Desiree Langley (Sholes)**
Jackson Lewis P.C.
11790 Sunrise Valley Drive - Suite 400
Reston, VA 20191
703-483-8329
Email: Desiree.Langley@jacksonlewis.com
*TERMINATED: 08/22/2022*

**Ezra Bronstein**
Mehri & Skalet, PLLC
2000 K Street NW, Suite 325
Washington, DC 20006
202-822-5100
Fax: 202-822-4997
Email: ebronstein@findjustice.com
*TERMINATED: 10/30/2023*

**Richard Condit**
Mehri & Skalet, PLLC
2000 K Street NW, Suite 325

Washington, DC 20006
202-822-5100
Fax: 202-822-4997
Email: rcondit@findjustice.com
*ATTORNEY TO BE NOTICED*

V.

**Mediator (Mandatory Program)**

**James A. Resila**
*TERMINATED: 01/31/2024*

represented by **James A. Resila**
Schwab & Gasparini, PLLC
17 Elk Street - 5th Floor
Albany, NY 12207
518-591-4664
Fax: 315-671-5013
Email:
JRESILA@SCHWABGASPARINI.COM
*TERMINATED: 01/31/2024*
*LEAD ATTORNEY*

V.

**Defendant**

**New York State Department of
Corrections and Community Supervision**
*TERMINATED: 11/18/2022*

represented by **Christopher J. Hummel**
New York State Attorney General - Albany
The Capitol
Albany, NY 12224
518-776-2578
Fax: 518-915-7754
Email: christopher.hummel@dfs.ny.gov
*TERMINATED: 06/21/2022*
*LEAD ATTORNEY*

**Jorge A. Rodriguez**
New York State Attorney General - Albany
The Capitol
Albany, NY 12224
518-776-2179
Fax: 518-915-7740
Email: jorge.rodriguez@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Carl Koenigsmann, M.D.**
*TERMINATED: 11/18/2022*

represented by **Christopher J. Hummel**
(See above for address)
*TERMINATED: 06/21/2022*
*LEAD ATTORNEY*

**Jorge A. Rodriguez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Morley, M.D.**
*Deputy Commissioner and Chief Executive*
*Officer for The New York Department of*
*Corrections and Community Supervision*
*(DOCCS)*

represented by **Christopher J. Hummel**
(See above for address)
*TERMINATED: 06/21/2022*
*LEAD ATTORNEY*

**Jorge A. Rodriguez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**David S. Dinello, M.D.**
*Regional Medial Director*

represented by **Christopher J. Hummel**
(See above for address)
*TERMINATED: 06/21/2022*
*LEAD ATTORNEY*

**Jorge A. Rodriguez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Patricia Henderson, R.N.**
*Deputy Superintendent for Health Services*

represented by **Christopher J. Hummel**
(See above for address)
*TERMINATED: 06/21/2022*
*LEAD ATTORNEY*

**Jorge A. Rodriguez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Betty M. Parkmond, R.N.**
*Nurse Director*

represented by **Christopher J. Hummel**
(See above for address)
*TERMINATED: 06/21/2022*
*LEAD ATTORNEY*

**Jorge A. Rodriguez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/28/2021 | 1 | COMPLAINT WITH JURY DEMAND against David S. Dinello, M.D., Patricia Henderson, R.N., Carl Koenigsmann, M.D., John Morley, M.D., New York State Department of Corrections and Community Supervision, Betty M. Parkmond, R.N. (Filing fee $402 receipt number ANYNDC-5567768) filed by Michael F. Salvana, M.D. (Attachments: # 1 Civil Cover Sheet)(khr) (Entered: 06/28/2021) |

| 06/28/2021 | 2 | Summons Issued as to Carl Koenigsmann, M.D. (Attachments: # 1 Summons issued as to John Morley, # 2 Summons issued as to NYS Department of Corrections, # 3 Summons issued as to Patricia Henderson, # 4 Summons issued as to David Dinello, # 5 Summons issued as to Betty Parkmond)(khr) (Entered: 06/28/2021) |
|---|---|---|
| 06/28/2021 | 3 | G.O. 25 FILING ORDER ISSUED: All conferences will be conducted by way of telephone conference. The parties are directed to call (877)402-9753 and enter access code 9983518. Initial Conference set for 10/6/2021 10:00 AM before Magistrate Judge Miroslav Lovric. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 9/29/2021. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (khr) (Entered: 06/28/2021) |
| 06/28/2021 | 4 | NOTICE of Admission Requirement as to Party Plaintiff; Attorney Desiree Langley, Mehri & Skalet, PLLC, 1250 Connecticut Ave., NW, Suite 300, Washington, DC 20036, Email address is dlangley@findjustice.com. Phone number is 202-822-5100. Admissions due by 7/12/2021. (khr)(Notice was emailed to attorney on 6/28/2021) (Entered: 06/28/2021) |
| 06/28/2021 | 5 | NOTICE of Admission Requirement as to Party Plaintiff; Attorney Richard E. Condit, Mehri & Skalet, PLLC, 1250 Connecticut Ave., NW, Suite 300, Washington, DC 20036, Email address is rcondit@findjustice.com. Phone number is 202-822-5100. Admissions due by 7/12/2021. (khr)(Notice emailed to attorney on 6/28/2021) (Entered: 06/28/2021) |
| 07/06/2021 | 6 | MOTION for Limited Admission Pro Hac Vice of Richard Condit Filing fee $100, receipt number ANYNDC-5575256. (Attachments: # 1 Supplement Certificate of Good Standing, # 2 Supplement Attorney Registration Form, # 3 Supplement Oath of Admission, # 4 Supplement Petition for Admission, # 5 Supplement Declaration of Sponsor) Motions referred to Miroslav Lovric. (de Oliveira, Carlo Alexandre) (Entered: 07/06/2021) |
| 07/06/2021 | 7 | MOTION for Limited Admission Pro Hac Vice of Desiree Langley Filing fee $100, receipt number ANYNDC-5575295. (Attachments: # 1 Supplement Certificate of Good Standing, # 2 Supplement Attorney Registration Form, # 3 Supplement Oath of Admission, # 4 Supplement Declaration of Sponsor, # 5 Supplement Petition for Admission, # 6 Supplement Certificate of Good Standing) Motions referred to Miroslav Lovric. (de Oliveira, Carlo Alexandre) (Entered: 07/06/2021) |
| 07/07/2021 | 8 | ORDER granting 6 Motion for Limited Admission Pro Hac Vice. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Signed by Magistrate Judge Miroslav Lovric on 7/7/2021. (jdp ) (Entered: 07/07/2021) |
| 07/07/2021 | 9 | ORDER granting 7 Motion for Limited Admission Pro Hac Vice. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Signed by Magistrate Judge Miroslav Lovric on 7/7/2021. (jdp ) (Entered: 07/07/2021) |

| 07/13/2021 | 10 | AFFIDAVIT of Service for Summons & Complaint with General Order #25 served on New York State Department of Corrections and Community Supervision, Carl Koenigsmann, M.D. and John Morley, M.D. on June 30, 2021, filed by Michael F. Salvana, M.D.. (Attachments: # 1 Affidavit Affidavit of Service, # 2 Affidavit Affidavit of Service)(de Oliveira, Carlo Alexandre) (Entered: 07/13/2021) |
|---|---|---|
| 07/14/2021 | | ***Answer due date updated for Carl Koenigsmann, M.D. answer due 7/21/2021; John Morley, M.D. answer due 7/21/2021; New York State Department of Corrections and Community Supervision answer due 7/21/2021. (khr) (Entered: 07/14/2021) |
| 07/19/2021 | 11 | Letter Motion from Christopher J. Hummel for David S. Dinello, M.D., Patricia Henderson, R.N., Carl Koenigsmann, M.D., John Morley, M.D., New York State Department of Corrections and Community Supervision, Betty M. Parkmond, R.N. requesting that the time to respond to the complaint for DOCCS, Dr. Koenigsmann, and Dr. Morley be extended to August 27, 2021. submitted to Judge Lovric *on consent of Plaintiff's counsel.* (Hummel, Christopher) (Entered: 07/19/2021) |
| 07/20/2021 | 12 | TEXT ORDER: Letter Motion 11 is GRANTED. Defendants Carl Koenigsmann, M.D., John Morley, M.D., and New York State Department of Corrections and Community Supervision are directed to file a response to the complaint by 8/27/2021. SO ORDERED by Magistrate Judge Miroslav Lovric on 7/20/2021. (jdp) (Entered: 07/20/2021) |
| 08/19/2021 | 13 | AFFIDAVIT of Service for Summons & Complaint with General Order #25 served on David S. Dinello, MD on July 20, 2021, filed by Michael F. Salvana, M.D.. (de Oliveira, Carlo Alexandre) (Entered: 08/19/2021) |
| 08/19/2021 | | ***Answer due date updated for David S. Dinello, M.D. answer due 8/10/2021. (khr) (Entered: 08/19/2021) |
| 08/19/2021 | 14 | Letter Motion from Christopher J. Hummel for David S. Dinello, M.D., Patricia Henderson, R.N., Carl Koenigsmann, M.D., John Morley, M.D., New York State Department of Corrections and Community Supervision, Betty M. Parkmond, R.N. requesting that the time for Defendant Dinello to respond to the complaint be extended to August 27, 2021. submitted to Judge Lovric *on consent of Plaintiff's counsel.* (Hummel, Christopher) (Entered: 08/19/2021) |
| 08/20/2021 | 15 | TEXT ORDER: Letter Motion 14 is GRANTED. Defendant Dinello is directed to file a response to the complaint by 8/27/2021. SO ORDERED by Magistrate Judge Miroslav Lovric on 8/20/2021. (jdp) (Entered: 08/20/2021) |
| 08/23/2021 | 16 | TEXT ORDER: The Rule 16 Initial Conference scheduled for 10/6/2021 at 10:00 a.m. has been RESCHEDULED for 10/12/2021 at 11:00AM, via telephone conference. The Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 10/5/2021. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) SO ORDERED by Magistrate Judge Miroslav Lovric on 8/23/2021. (jdp ) (Entered: 08/23/2021) |
| 08/23/2021 | | NOTICE OF TELECONFERENCE: a telephone conference is scheduled for 10/12/2021 at 11:00 a.m. before Magistrate Judge Miroslav Lovric. The parties are directed to call 877-402-9753 and enter access code 9983518. (jdp ) (Entered: 08/23/2021) |
| 08/24/2021 | 17 | Letter Motion from Christopher J. Hummel for David S. Dinello, M.D., Carl Koenigsmann, M.D., John Morley, M.D., New York State Department of Corrections and Community Supervision requesting an extension of time to September 3, 2021 to respond to the complaint. submitted to Judge Lovric *on consent of Plaintiff's counsel.* (Hummel, Christopher) (Entered: 08/24/2021) |

| 08/25/2021 | 18 | TEXT ORDER: Letter Motion <u>17</u> is GRANTED. Defendants Carl Koenigsmann, M.D., John Morley, M.D., David S. Dinello, M.D., and New York State Department of Corrections and Community Supervision are directed to file a response to the complaint by 9/3/2021. All other schedules remain in effect. SO ORDERED by Magistrate Judge Miroslav Lovric on 8/25/2021. (jdp ) (Entered: 08/25/2021) |
|---|---|---|
| 08/26/2021 | <u>19</u> | WAIVER OF SERVICE Returned Executed by Michael F. Salvana, M.D.. Patricia Henderson, R.N. waiver sent on 8/17/2021, answer due 10/18/2021; Betty M. Parkmond, R.N. waiver sent on 8/17/2021, answer due 10/18/2021. (Attachments: # <u>1</u> Waiver of the Service of Summons)(de Oliveira, Carlo Alexandre) (Entered: 08/26/2021) |
| 08/31/2021 | <u>20</u> | NOTICE of Appearance by Richard Condit on behalf of Michael F. Salvana, M.D. (Condit, Richard) (Entered: 08/31/2021) |
| 08/31/2021 | <u>21</u> | NOTICE of Appearance by Desiree Langley (Sholes) on behalf of Michael F. Salvana, M.D. (Langley (Sholes), Desiree) (Entered: 08/31/2021) |
| 09/02/2021 | <u>22</u> | MOTION to Dismiss for Failure to State a Claim filed by David S. Dinello, M.D., Patricia Henderson, R.N., Carl Koenigsmann, M.D., John Morley, M.D., New York State Department of Corrections and Community Supervision, Betty M. Parkmond, R.N.. Motion returnable before Judge Sannes Response to Motion due by 9/23/2021. Reply to Response to Motion due by 9/30/2021 (Attachments: # <u>1</u> Memorandum of Law) (Hummel, Christopher) (Entered: 09/02/2021) |
| 09/07/2021 | 23 | TEXT ORDER: In light of the filing of Motion to Dismiss 22 , The Rule 16 initial conference scheduled for 10/12/2021 before Magistrate Judge Miroslav Lovric via telephone conference and the deadlines for filing of the Civil Case Management Plan and exchange of the Mandatory Disclosures are STAYED without date. SO ORDERED by Magistrate Judge Miroslav Lovric on 9/7/2021. (jdp ) (Entered: 09/07/2021) |
| 09/23/2021 | <u>24</u> | MEMORANDUM OF LAW *in Opposition to Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)* filed by Michael F. Salvana, M.D.. (Condit, Richard) (Entered: 09/23/2021) |
| 06/20/2022 | <u>25</u> | NOTICE of Appearance by Jorge A. Rodriguez on behalf of All Defendants (Rodriguez, Jorge) (Entered: 06/20/2022) |
| 08/10/2022 | <u>26</u> | MEMORANDUM-DECISION AND ORDER granting in part and denying in part <u>22</u> Motion to Dismiss for Failure to State a Claim. ORDERED that Defendants motion to dismiss (Dkt. No. 22) is GRANTED as to Plaintiffs Equal Protection, N.Y. Lab. Law § 741, and N.Y. Civ. Serv. Law § 75-b claims (the First, Third and Fourth Causes of Action); and it is further ORDERED that Defendants motion to dismiss (Dkt. No. 22) is GRANTED as to Plaintiffs claims against Defendants DOCCS, Koenigsmann, and Parkmond; and it is further ORDERED that Defendants motion is otherwise DENIED; and it is further ORDERED that if Plaintiff does not file a letter motion seeking leave to amend by August 23, 2022, Defendants DOCCS, Koenigsmann, and Parkmond will be terminated and Plaintiffs First Amendment retaliation claim under 42 U.S.C. § 1983 against Defendants Henderson, Dinello, and Morley will proceed. IT IS SO ORDERED. Signed by Judge Brenda K. Sannes on 8/10/2022. (khr) (Entered: 08/10/2022) |
| 08/11/2022 | <u>27</u> | Letter Motion from Plaintiff for Michael F. Salvana, M.D. requesting Extension of Deadline submitted to Judge Brenda K. Sannes . (de Oliveira, Carlo Alexandre) (Entered: 08/11/2022) |
| 08/15/2022 | 28 | TEXT ORDER: granting the <u>27</u> request for an extension of time. Plaintiff may file a letter motion seeking leave to amend and/or move for reconsideration by 9/12/2022. SO ORDERED by Judge Brenda K. Sannes on 8/15/2022. (nmk) (Entered: 08/15/2022) |

| 08/19/2022 | 29 | MOTION to Withdraw as Attorney filed by Michael F. Salvana, M.D.. Response to Motion due by 9/9/2022 Motions referred to Miroslav Lovric. (Langley (Sholes), Desiree) (Entered: 08/19/2022) |
|---|---|---|
| 08/22/2022 | 30 | ORDER granting 29 Motion to Withdraw as Attorney. Attorney Desiree Langley (Sholes) terminated. Signed by Magistrate Judge Miroslav Lovric on 8/22/2022. (jdp ) (Entered: 08/22/2022) |
| 09/12/2022 | 31 | Letter Motion from Carlo A.C. de Oliveira for Michael F. Salvana, M.D. requesting Permission to file an Amended Complaint submitted to Judge Brenda K. Sannes . (Attachments: # 1 Exhibit(s) Exhibit A, # 2 Exhibit(s) Exhibit B)(de Oliveira, Carlo Alexandre) (Entered: 09/12/2022) |
| 09/12/2022 | 32 | AFFIDAVIT re 31 Letter Motion from Carlo A.C. de Oliveira for Michael F. Salvana, M.D. requesting Permission to file an Amended Complaint submitted to Judge Brenda K. Sannes by Michael F. Salvana, M.D.. (de Oliveira, Carlo Alexandre) (Entered: 09/12/2022) |
| 09/12/2022 | 33 | First MOTION for Reconsideration re 26 Order on Motion to Dismiss for Failure to State a Claim,,, filed by Michael F. Salvana, M.D.. Motion returnable before Judge Brenda K. Sannes Response to Motion due by 10/3/2022 (Attachments: # 1 Affirmation, # 2 Memorandum of Law, # 3 Affidavit) (de Oliveira, Carlo Alexandre) (Entered: 09/12/2022) |
| 09/14/2022 | | TEXT NOTICE re 31 Letter Motion requesting Permission to file an Amended Complaint: Response to Motion due by 10/3/2022. (nmk) (Entered: 09/14/2022) |
| 09/27/2022 | 34 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., Carl Koenigsmann, M.D., John Morley, M.D., New York State Department of Corrections and Community Supervision, Betty M. Parkmond, R.N. requesting extension of time to file opposition to motions for reconsideration and for leave to amend complaint submitted to Judge Brenda K Sannes, USDJ . (Rodriguez, Jorge) (Entered: 09/27/2022) |
| 09/28/2022 | 35 | TEXT ORDER: granting 34 Letter Request for an extension of time regarding deadlines related to the 31 Letter Motion to file an Amended Complaint and 33 First MOTION for Reconsideration. Responses to the pending Motions are due by 11/2/2022. SO ORDERED by Chief Judge Brenda K. Sannes on 9/28/2022. (nmk) (Entered: 09/28/2022) |
| 11/02/2022 | 36 | RESPONSE in Opposition re 33 First MOTION for Reconsideration re 26 Order on Motion to Dismiss for Failure to State a Claim,,, filed by Michael F. Salvana, M.D.. Motion returnable before Judge Brenda K. Sannes, 31 Letter Motion from Carlo A.C. de Oliveira for Michael F. Salvana, M.D. requesting Permission to file an Amended Complaint submitted to Judge Brenda K. Sannes filed by David S. Dinello, M.D., Patricia Henderson, R.N., Carl Koenigsmann, M.D., John Morley, M.D., New York State Department of Corrections and Community Supervision, Betty M. Parkmond, R.N.. (Rodriguez, Jorge) (Entered: 11/02/2022) |
| 11/18/2022 | 37 | MEMORANDUM-DECISION AND ORDER: It is hereby ORDERED that Plaintiff's motion for reconsideration (Dkt. No. 33 ) is DENIED. It is further ORDERED that Plaintiff's motion for leave to file an amended complaint (Dkt. No. 31 ) is DENIED to the extent it seeks to assert any claim against DOCCS. It is further ORDERED that Plaintiff's motion for leave to file an amended complaint is otherwise GRANTED. It is further ORDERED that Plaintiff is directed to file the proposed amended complaint, in conformance with the above, by November 28, 2022. Signed by Chief Judge Brenda K. Sannes on 11/18/2022. (nmk) (Entered: 11/18/2022) |

| | | |
|---|---|---|
| 11/28/2022 | 38 | AMENDED COMPLAINT against David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. filed by Michael F. Salvana, M.D..(de Oliveira, Carlo Alexandre) (Entered: 11/28/2022) |
| 11/29/2022 | | ***Answer due date updated for David S. Dinello, M.D. answer due 12/12/2022; Patricia Henderson, R.N. answer due 12/12/2022; John Morley, M.D. answer due 12/12/2022; Betty M. Parkmond, R.N. answer due 12/12/2022. (khr) (Entered: 11/29/2022) |
| 12/05/2022 | | NOTICE of Hearing: Initial Conference is set for 1/3/2023 at 11:00 AM before Magistrate Judge Miroslav Lovric. The Courtroom Deputy will issue a Teams invite to the parties to participate. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 12/27/2022. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.). (jdp ) (Entered: 12/05/2022) |
| 12/12/2022 | 39 | ANSWER to 38 Amended Complaint by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N..(Rodriguez, Jorge) (Entered: 12/12/2022) |
| 12/26/2022 | 40 | CIVIL CASE MANAGEMENT PLAN by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. (Rodriguez, Jorge) (Entered: 12/26/2022) |
| 01/03/2023 | | Minute Entry for proceedings held before Magistrate Judge Miroslav Lovric: an initial conference was held on 1/3/2023. Pretrial deadlines were discussed and set. A telephone conference is scheduled for 4/6/2023 at 10:00 a.m. Appearances: C. de Oliveria, Esq. and R. Condit, Esq. for the Plaintiff and J. Rodriguez, Esq. for the Defendants. (jdp ) (Entered: 01/03/2023) |
| 01/03/2023 | 41 | TEXT ORDER: On or before 3/20/2023, the parties shall file status reports regarding the progress of the litigation. A telephone conference is scheduled for 4/6/2023 at 10:00 a.m. The Courtroom Deputy will provide counsel with a Teams invite that contains the call-in information. SO ORDERED by Magistrate Judge Miroslav Lovric on 1/3/2023.(jdp ) (Entered: 01/03/2023) |
| 01/03/2023 | 42 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of trial: 5. Preferred Trial Location: Albany. Joinder of Parties due by 5/1/2023. Amended Pleadings due by 5/1/2023. Discovery due by 10/31/2023. Plaintiffs Expert Disclosure Deadline is 8/2/2023. Defendants Expert Disclosure Deadline is 9/18/2023. Rebuttal Expert Disclosure Deadline is 10/2/2023. Motions to be filed by 11/30/2023. Signed by Magistrate Judge Miroslav Lovric on 1/3/2023. (jdp ) (Main Document 42 replaced on 1/4/2023) (jdp, ). (Entered: 01/03/2023) |
| 01/03/2023 | 43 | ORDER REFERRING CASE to Mandatory Mediation. Deadline for Mediator Selection is 1/31/2023. Deadline for completion of Mandatory Mediation is 7/31/2023. Signed by Magistrate Judge Miroslav Lovric on 1/3/2023. (jdp ) (Entered: 01/03/2023) |
| 01/03/2023 | 44 | DUNTON ORDER. Signed by Magistrate Judge Miroslav Lovric on 1/3/2023. (jdp ) (Entered: 01/03/2023) |
| 01/04/2023 | | CLERK'S CORRECTION OF DOCKET ENTRY : Clerk replaced Uniform Pretrial Scheduling Order to reflect the correct filing of motions deadline. (jdp) (Entered: 01/04/2023) |
| 01/30/2023 | 45 | STIPULATION SELECTING MEDIATOR: IT IS HEREBY STIPULATED AND AGREED that James A. Resila, Esq. has been selected, contacted and has agreed to serve as Mediator for this action. IT IS FURTHER STIPULATED AND AGREED, that counsel will participate in the mediation session in good faith and confer with the Mediator |

| | | |
|---|---|---|
| | | regarding the scheduling of additional conferences, bearing in mind the deadline for completion of Mediation set forth in the Court's Order Referring the Case to Mediation. Stipulation signed by: Jorge A. Rodriguez and Carlo A.C. de Oliveira and Richard E. Condit. Dated: January 27, 2023 and January 30, 2023(de Oliveira, Carlo Alexandre) (Entered: 01/30/2023) |
| 03/20/2023 | 47 | STATUS REPORT by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. (Rodriguez, Jorge) (Entered: 03/20/2023) |
| 03/31/2023 | | Set Deadlines: Motions to be filed by 11/30/2023. (nmk) (Entered: 03/31/2023) |
| 04/06/2023 | | Minute Entry for proceedings held before Magistrate Judge Miroslav Lovric: a status conference was held on 4/6/2023. The Court reminded the parties as to the schedules and deadlines as set forth in Dkt. Nos 42 & 43. The parties advised the Court as to the progress of discovery and this litigation. The parties are directed to file next status reports by 6/13/2023. Appearances: C. de Oliveira, Esq., for the Plaintiff; and J. Rodriguez, Esq., for the Defendants. (jdp ) (Entered: 04/06/2023) |
| 04/06/2023 | 48 | TEXT ORDER: On or before 6/13/2023, the parties shall file next status reports regarding the progress of discovery and the litigation. SO ORDERED by Magistrate Judge Miroslav Lovric on 4/6/2023.(jdp ) (Entered: 04/06/2023) |
| 06/13/2023 | 49 | STATUS REPORT by Michael F. Salvana, M.D.. (de Oliveira, Carlo Alexandre) (Entered: 06/13/2023) |
| 06/14/2023 | 50 | TEXT ORDER: An on the record conference is scheduled for 6/26/2023 at 11:00 a.m., via Teams teleconference, to address the issues raised in Status Report 49 . SO ORDERED by Magistrate Judge Miroslav Lovric on 6/14/2023. (jdp ) (Entered: 06/14/2023) |
| 06/14/2023 | 51 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting change of conference date submitted to Judge Miroslav Lovric, USMJ . (Rodriguez, Jorge) (Entered: 06/14/2023) |
| 06/15/2023 | 52 | TEXT ORDER: Letter Motion 51 is GRANTED insofar as and to the extent that the on the record conference scheduled for 6/26/2023 is RE-SCHEDULED for 6/23/2023 at 4:00 p.m., via Teams teleconference, to address the issues raised in Status Report 49. SO ORDERED by Magistrate Judge Miroslav Lovric on 6/15/2023. (jdp ) (Entered: 06/15/2023) |
| 06/20/2023 | 53 | MOTION for Limited Admission Pro Hac Vice of Chaim Ezra Bronstein Filing fee $100, receipt number ANYNDC-6340523. (Attachments: # 1 Motion to Appear Pro Hac Vice, # 2 Certificate of Good Standing - NY, # 3 Certificate of Good Standing - DC, # 4 Certificate of Good Standing - FL, # 5 Declaration Declaration of Sponsor, # 6 Proposed Order/Judgment Proposed Order for Pro Hac Vice Admission) Motions referred to Miroslav Lovric. (de Oliveira, Carlo Alexandre) (Entered: 06/20/2023) |
| 06/23/2023 | | Minute Entry for proceedings held before Magistrate Judge Miroslav Lovric: an on the record conference was held on 6/23/2023. The Court reminded the parties as to the schedules and deadlines as set forth in Dkt. No 42. These deadlines will not be extended without good cause. The Court and parties addressed the issues raised in Status Report 49 . The Court extended the mandatory mediation deadline to 10/31/2023. The parties advised the Court as to a discovery dispute concerning interrogatories served by Plaintiff on Defendants. The parties are directed to confer and attempt to resolve the disputes. A motion schedule was issued. Appearances: C. de Oliveira, Esq., for the Plaintiff; J. Rodriguez, Esq., for the Defendants; and R. Lynch, Court Reporter. (jdp ) (Entered: 06/26/2023) |

| | | |
|---|---|---|
| 06/23/2023 | 54 | TEXT ORDER: The parties are directed to confer and attempt to resolve the discovery disputes. No later than 7/7/2023, the parties are directed to file either (1) Motions to Compel, or (2) status reports advising that the discovery disputes have been resolved. If Motions to Compel are filed, all Responses shall be filed by 7/21/2023 and an on the record Hearing is scheduled for 7/31/2023 at 1:00 p.m., via Teams teleconferencing. The mandatory mediation deadline is extended to 10/31/2023. The deadlines and schedules in Dkt. No. 42 will not be extended without good cause. SO ORDERED by Magistrate Judge Miroslav Lovric on 6/23/2023. (jdp ) (Entered: 06/26/2023) |
| 06/26/2023 | | **Notice of Attorney Admission Filing Deficiency** re: 53 Motion for Limited Admission Pro Hac Vice OF Chaim Ezra Bronstein. Pursuant to LR 83.1(d), the sponsor and/or applicant **MUST** provide the following required documents: a New Attorney E-Filing Registration Form; The corrected documents should be electronically filed with the Court by selecting the 'Supplemental Admission documents' event, which is found under the 'Other Documents' menu. Once all requirements under LR 83.1(d) have been met, the motion will be forwarded to the assigned Magistrate Judge for consideration. (tad, ) (Entered: 06/26/2023) |
| 06/26/2023 | 55 | Supplemental Admission documents re: 53 Motion for Limited Admission Pro Hac Vice,. (de Oliveira, Carlo Alexandre) (Entered: 06/26/2023) |
| 06/27/2023 | 56 | ORDER granting 53 Motion for Limited Admission Pro Hac Vice. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Signed by Magistrate Judge Miroslav Lovric on 6/27/2023. (jdp) (Entered: 06/27/2023) |
| 07/07/2023 | 57 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting Order directing disclosure [re Dkt 54] submitted to Judge Miroslav Lovric, USMJ . (Attachments: # 1 Exhibit(s) A)(Rodriguez, Jorge) (Entered: 07/07/2023) |
| 07/07/2023 | 58 | LETTER BRIEF by Michael F. Salvana, M.D.. (Attachments: # 1 Exhibit(s) Attachment to Letter Brief)(de Oliveira, Carlo Alexandre) (Entered: 07/07/2023) |
| 07/14/2023 | 59 | NOTICE OF APPEARANCE by Ezra Bronstein on behalf of Michael F. Salvana, M.D. (Bronstein, Ezra) (Entered: 07/14/2023) |
| 07/14/2023 | 60 | LETTER BRIEF *in opposition to Defendants' July 7, 2023 motion to compel* by Michael F. Salvana, M.D.. (Bronstein, Ezra) (Entered: 07/14/2023) |
| 07/21/2023 | 61 | LETTER BRIEF *in opposition to plaintiff's motion to compel [Dkt 58]* by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. (Rodriguez, Jorge) (Entered: 07/21/2023) |
| 07/31/2023 | 62 | TEXT ORDER: Pursuant to the Hearing held on 7/31/2023, addressing Dkt. Nos. 57, 58, 60, & 61, and for the reasons set forth therein: (1) any Protective Order jointly proposed by the parties shall be filed by 8/11/2023 for consideration by the Court; (2) any proposed Order authorizing disclosure of non-party or 3rd party medical records shall be filed by 8/11/2023 for consideration by the Court; (3) in regards to Defendants seeking collateral sources of reimbursements or payments for economic loss claimed by Plaintiff (a) no later than 8/7/2023 Defendants shall serve a demand on Plaintiff more clearly and more specifically identifying the collateral sources sought, (b) no later than 8/18/2023, Plaintiff shall provide to Defendants the collateral source information as sought by Defendants, or |

| | | |
|---|---|---|
| | | no later than 8/11/2023 Plaintiff shall file on the docket a detailed letter specifically identifying any collateral source demands to which Plaintiff objects and state the reasons thereof; (4) the issue and dispute regarding medical records of Plaintiff is MOOT, in that, the parties have resolved this dispute; (5) regarding Interrogatories 7, 19, 20, 21, & 22, as served by Plaintiff on Defendants, Defendants shall respond fully and completely to said interrogatories no later than 9/5/2023; (6) no later than 8/18/2023, Defendants shall provide to Plaintiff all ESI discovery materials; (7) as for the three non-party inmate witnesses, as identified in Dkt. No. 49, the parties are authorized and it is so ordered that depositions of those three inmates may proceed; (8) the following deadlines and schedules are extended only insofar as and to the extent that, (a) Plaintiff Expert Disclosure Deadline is 8/16/2023, (b) Defendants Expert Disclosure Deadline is 10/2/2023, and the Rebuttal Expert Disclosure Deadline is 10/13/2023; and (9) all the other deadlines and schedules as set forth in Dkt. Nos. 42 & 54 remain in effect, and all current deadlines will not be extended any further without good cause. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 7/31/2023. (jdc ) (Entered: 08/02/2023) |
| 08/02/2023 | | Minute Entry for proceedings held before Magistrate Judge Miroslav Lovric: an on the record Hearing was held on 7/31/2023. The Court addressed motions to compel and responses to motions from Plaintiff and Defendants as set forth in Dkt. Nos. 57, 58, 60, & 61. The Court heard argument from the parties. The Court set forth its analysis, reasoning, and decisions on the record. Also and for good cause shown, the Court extended several deadlines. Appearances: C. de Oliveira, Esq., E. Bronstein, Esq., and R. Condit, Esq., for the Plaintiff; J. Rodriguez, Esq., for the Defendants; and R. Lynch, Court Reporter. (jdc ) (Entered: 08/02/2023) |
| 08/09/2023 | 63 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting endorsement of proposed stipulated orders submitted to Judge Miroslav Lovric, USMJ . (Attachments: # 1 Proposed Order/Judgment [protective], # 2 Proposed Order/Judgment [HIPAA disclosure])(Rodriguez, Jorge) (Entered: 08/09/2023) |
| 08/10/2023 | 64 | STIPULATED PROTECTIVE ORDER. Signed by Magistrate Judge Miroslav Lovric on 8/10/2023. (amt) (Entered: 08/10/2023) |
| 08/10/2023 | 65 | STIPULATION AND ORDER Authorizing the Disclosure of Medical Records. Signed by Magistrate Judge Miroslav Lovric on 8/10/2023. (amt) (Entered: 08/10/2023) |
| 08/25/2023 | | Reset Deadlines: Per Dkt. No. 54 , the deadline for completion of Mandatory Mediation is reset to 10/31/2023. (sal) (Entered: 08/25/2023) |
| 10/18/2023 | 66 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting extension of time to complete discovery submitted to Judge Miroslav Lovric, USMJ . (Rodriguez, Jorge) (Entered: 10/18/2023) |
| 10/19/2023 | 67 | TEXT ORDER: Letter Motion 66 is GRANTED insofar as and to the extent that, (1) all discovery, including all depositions, shall be completed by 1/2/2024, (2) mandatory mediation shall be completed by 1/2/2024, and (3) dispositive motions shall be filed by 2/2/2024. These deadlines will not be extended any further without extraordinary cause. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 10/19/2023. (jdc ) (Entered: 10/19/2023) |
| 10/27/2023 | 68 | MOTION to Withdraw as Attorney filed by Michael F. Salvana, M.D.. Response to Motion due by 11/17/2023 Motions referred to Miroslav Lovric. (Bronstein, Ezra) (Entered: 10/27/2023) |
| 10/30/2023 | 69 | ORDER granting 68 Motion to Withdraw as Attorney. Attorney Ezra Bronstein terminated. Signed by Magistrate Judge Miroslav Lovric on 10/30/2023. (jdc ) (Entered: |

| | | 10/30/2023) |
|---|---|---|
| 12/01/2023 | 70 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting extension of deadline to complete mandatory mediation submitted to Judge Miroslav Lovric, USMJ . (Rodriguez, Jorge) (Entered: 12/01/2023) |
| 12/04/2023 | 71 | ORDER: Letter Motion 70 is GRANTED In Part and DENIED In Part, insofar as and to the extent that the mandatory mediation deadline is extended to 2/2/2024. Furthermore, Plaintiff is directed to serve on all Defendants a settlement demand no later than 12/18/2023. The parties are reminded and cautioned that all discovery, including all depositions, shall be completed by 1/2/2024, and dispositive motions shall be filed by 2/2/2024. See Dkt. No. 67. These deadlines will not be extended any further without extraordinary cause. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 12/4/2023. (jdc ) (Entered: 12/04/2023) |
| 12/21/2023 | 72 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting extension of time to complete discovery submitted to Judge Miroslav Lovric, USMJ . (Rodriguez, Jorge) (Entered: 12/21/2023) |
| 12/26/2023 | 73 | TEXT ORDER: Letter Motion 72 is GRANTED In Part and DENIED In Part, insofar as and to the extent that: (1) the mandatory mediation deadline remains 2/2/2024 and this deadline will not be extended any further; (2) the all discovery deadline, including all depositions, is extended and shall be completed by 1/23/2024; and (3) the dispositive motions filing deadline is extended to 2/23/2024. The parties are advised and cautioned that these deadlines will not be extended any further without extraordinary cause. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 12/26/2023. (amt) (Entered: 12/26/2023) |
| 01/30/2024 | 74 | REPORT OF MANDATORY MEDIATION - A Mandatory Mediation session was held on 01/30/2024. Total Hours Spent by Mediator: 6; The outcome of Mandatory Mediation is: MEDIATION IS COMPLETE. CASE DID NOT SETTLE. The case will proceed toward trial pursuant to the Courts Uniform Pretrial Scheduling Order. (Resila, James) (Entered: 01/30/2024) |
| 01/30/2024 | 75 | STATUS REPORT by Michael F. Salvana, M.D.. (de Oliveira, Carlo Alexandre) (Entered: 01/30/2024) |
| 01/31/2024 | | **ADR COMPLETED - CASE DID NOT SETTLE.** Mediator James A. Resila terminated. The mediator and attorneys who attended the mediation session are asked to complete a survey with respect to the Mandatory Mediation Program. Attorneys for parties can access the survey at https://forms.office.com/g/AGz4E8EBVa. Mediators can access the survey at https://forms.office.com/g/pfQiD2e4jy. Any questions can be directed to the ADR Coordinator.(amt) (Entered: 01/31/2024) |
| 01/31/2024 | 76 | TEXT ORDER: In light of the discovery disputes as outlined in Status Report 75 , (1) Plaintiff is authorized to file a Motion to Compel and any such motion shall be filed by 2/7/2024, (2) Defendants shall file a Response by 2/14/2024 to any Motion to Compel as filed by Plaintiff, (3) an on the record, In Person, Hearing is scheduled for 2/20/2024 at 1:00 p.m., in Binghamton, New York, before Magistrate Judge Miroslav Lovric. In Person appearances are required. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 1/31/2024. (jdc ) (Entered: 01/31/2024) |
| 02/07/2024 | 77 | MOTION to Compel filed by Michael F. Salvana, M.D.. Response to Motion due by 2/14/2024 (Attachments: # 1 Declaration Attorney, # 2 Exhibit(s) 1, # 3 Exhibit(s) 2, # 4 Exhibit(s) 3, # 5 Exhibit(s) 4, # 6 Exhibit(s) 5, # 7 Exhibit(s) 6, # 8 Exhibit(s) 7, # 9 |

| | | Memorandum of Law) Motions referred to Miroslav Lovric. (de Oliveira, Carlo Alexandre) Modified on 2/7/2024 (khr). (Entered: 02/07/2024) |
|---|---|---|
| 02/07/2024 | | CLERK'S CORRECTION OF DOCKET ENTRY re 77 Motion to Compel. Corrected the Response date to 2/14/2024 as reflected in the Text Order dated 1/31/2024 at Dkt. # 76 . (khr) (Entered: 02/07/2024) |
| 02/07/2024 | 78 | TEXT ORDER: Defendants shall file a Response by 2/14/2024 to Motion to Compel 77. The on the record, In Person, Hearing remains scheduled for 2/20/2024 at 1:00 p.m., in Binghamton, New York, before Magistrate Judge Miroslav Lovric. In Person appearances are required. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 2/7/2024. (jdc ) (Entered: 02/07/2024) |
| 02/07/2024 | | Reset Deadlines as to 77 MOTION to Compel filed by Michael F. Salvana, M.D... Response to Motion 77 is now due on or before 2/14/2024 (jdc ) (Entered: 02/07/2024) |
| 02/08/2024 | 79 | MOTION for Limited Admission Pro Hac Vice of Andrea F. Forsee (Fee is waived) **[THIS DOCUMENT IS RESTRICTED AND VIEWABLE BY COURT USERS ONLY]** (Attachments: # 1 Affidavit, # 2 Exhibit(s), # 3 Exhibit(s), # 4 Exhibit(s), # 5 Declaration, # 6 Proposed Order/Judgment) Motions referred to Miroslav Lovric. (de Oliveira, Carlo Alexandre) (Entered: 02/08/2024) |
| 02/09/2024 | 80 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting adjournment of hearing scheduled for 2/20 submitted to Judge Miroslav Lovric, USMJ . (Rodriguez, Jorge) (Entered: 02/09/2024) |
| 02/09/2024 | 81 | ORDER denying 80 Letter Request for an adjournment of hearing scheduled for 2/20. All previously set schedules and deadlines remain in effect. Signed by Magistrate Judge Miroslav Lovric on 2/9/2024. (jdc ) (Entered: 02/09/2024) |
| 02/14/2024 | | **Notice of Attorney Admission Filing Deficiency** re: 79 Motion for Limited Admission Pro Hac Vice of Andrea Forsee. Pursuant to LR 83.1(d), the sponsor or applicant **MUST** pay the required fee for Pro Hac Vice admission of $100.00 though Pay.gov as referenced in the secure link provided via email on 2/13/2024. Once all requirements under LR 83.1(d) have been met, the motion will be forwarded to the assigned Magistrate Judge for consideration. (tad) (Entered: 02/14/2024) |
| 02/14/2024 | | Filing fee: $ 100.00, receipt number 27BRMDGT- Motion for Pro Hac Vice of Andrea Forsee. (khr) (Entered: 02/14/2024) |
| 02/14/2024 | 82 | RESPONSE in Opposition re 77 MOTION to Compel filed by Michael F. Salvana, M.D.. filed by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. (Attachments: # 1 Memorandum of Law)(Rodriguez, Jorge) (Entered: 02/14/2024) |
| 02/15/2024 | 83 | ORDER granting 79 Motion for Limited Admission Pro Hac Vice. Counsel is hereby advised that as of January 16, 2018, the NYND has converted to NextGen. Due to this conversion, you must now register for Pro Hac Vice access through your PACER account. **This is the only notice you will receive concerning this requirement. You will not have access to electronically file in this case until your Pro Hac Vice request has been processed through the PACER system.** Step-by-step instructions on how to complete this process are available at http://www.nynd.uscourts.gov/attorney-admissions-nextgen. Counsel is reminded that, once the above is accomplished, a NOTICE OF APPEARANCE MUST BE FLED IN THIS ACTION or you will not receive electronic notifications in the case. Signed by Magistrate Judge Miroslav Lovric on 2/15/2024. (jdc ) (Entered: 02/15/2024) |

| | | |
|---|---|---|
| 02/20/2024 | | Minute Entry for proceedings held before Magistrate Judge Miroslav Lovric: an on the record Hearing was held on 2/20/2024. The Court addressed Motion to Compel 77 and Response 82 . The Court heard argument from the parties. The Court set forth its analysis, reasoning, and decisions on the record. Motion to Compel 77 is DENIED. The Court directed the parties to continue to confer regarding several discovery issues and to also confer with DOCCS counsel. The Court extended several deadlines. Appearances: C. de Oliveira, Esq., for the Plaintiff; J. Rodriguez, Esq., for the Defendants; and FTR Recording. (time: 1:00PM - 2:45PM) (jdc, ) (Entered: 02/21/2024) |
| 02/20/2024 | 84 | TEXT ORDER: Pursuant to the Hearing held on 2/20/2024, Motion to Compel 77 is DENIED. The parties are directed to continue to confer regarding several discovery issues and to also confer with DOCCS counsel. The deadlines and schedules are extended as follows: (1) the parties shall file detailed status reports by 3/5/2024; (2) all discovery, including depositions, shall be completed by 4/2/2024; (3) final status reports shall be filed by 4/2/2024; and (4) dispositive motions shall be filed by 5/7/2024. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 2/20/2024. (jdc ) (Entered: 02/21/2024) |
| 02/20/2024 | | Reset Deadlines: Discovery due by 4/2/2024. Motions to be filed by 5/7/2024. 1st Status Report due by 3/5/2024. 2nd Status Report due by 4/2/2024. (jdc) (Entered: 02/21/2024) |
| 02/23/2024 | 85 | NOTICE OF APPEARANCE by Andrea Forsee on behalf of Michael F. Salvana, M.D. (Forsee, Andrea) (Entered: 02/23/2024) |
| 03/05/2024 | 86 | STATUS REPORT by Michael F. Salvana, M.D.. (de Oliveira, Carlo Alexandre) (Entered: 03/05/2024) |
| 04/02/2024 | 87 | NOTICE by Michael F. Salvana, M.D. *STATUS REPORT* (de Oliveira, Carlo Alexandre) (Entered: 04/02/2024) |
| 04/03/2024 | 88 | TEXT ORDER: In light of Status Report 87 : (1) Plaintiff is authorized to file a Motion to Compel against NYS DOCCS and any such motion shall be filed and served upon NYS DOCCS and counsel for NYS DOOCS by 4/12/2024; (2) Plaintiff shall file an affidavit of service on the docket by 4/12/2024 demonstrating service on NYS DOCCS and their counsel of, (a) any Motion to Compel, and (b) a copy of this Text Order; (3) NYS DOCCS shall respond and file their response to any such Motion to Compel by 4/26/2024; (4) an on the record Hearing is scheduled for 5/1/2024 at 1:00 p.m., IN PERSON, in Binghamton, New York, and In Person appearances are required from all counsel in this matter and also counsel for NYS DOCCS; and (5) the deadlines and schedules in Text Order Dkt. No. 84 remain in effect. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 4/3/2024. (Plaintiff is directed to serve a copy of this Text Order on NYS DOCCS and counsel for NYS DOCCS no later than 4/12/2024, and also to file by that date an affidavit of service on the docket) (jdc ) (Entered: 04/03/2024) |
| 04/04/2024 | 89 | NOTICE by Michael F. Salvana, M.D. *Affidavit of Service Per Court's Order (Dkt. No. 88)* (de Oliveira, Carlo Alexandre) (Entered: 04/04/2024) |
| 05/01/2024 | 90 | TEXT ORDER: Plaintiff has failed to comply with Text Order 88 and has failed to file any motion to compel. See Docket. NYS DOCCS has not filed any response to such motion since a motion to compel was not filed. See Docket. Neither party filed any letter advising the Court that the motion to compel was not forthcoming and that the Hearing today on such a motion was no longer necessary. Given that no motion was filed, the on the record Hearing scheduled for today, 5/1/2024, is therefore unnecessary, moot, and thereby cancelled. The purpose of the Hearing was to address the motion to compel, which was never filed. See Docket. The discovery deadline expired on 4/2/2024 and discovery is therefore closed. See Docket. The remaining deadline in Text Order Dkt. No. 84 remains in effect. SO ORDERED by U.S. Magistrate Judge Miroslav Lovric on 5/1/2024. (amt) (Entered: 05/01/2024) |

| 05/02/2024 | 91 | STATUS REPORT by Michael F. Salvana, M.D.. (de Oliveira, Carlo Alexandre) (Entered: 05/02/2024) |
|---|---|---|
| 05/07/2024 | 92 | MOTION for Summary Judgment filed by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. Motion returnable before Judge Brenda K. Sannes, USDJ. Response to Motion due by 5/28/2024. Reply to Response to Motion due by 6/4/2024 (Attachments: # 1 Declaration of Patricia Henderson, # 2 Exhibit(s) A-F to Henderson Decl, # 3 Declaration of David Dinello, # 4 Exhibit(s) A-G to Dinello Decl, # 5 Declaration of Betty Parkmond, # 6 Exhibit(s) A to Parkmond Decl, # 7 Declaration of John Morley, # 8 Statement of Material Facts, # 9 Memorandum of Law) (Rodriguez, Jorge) (Entered: 05/07/2024) |
| 05/07/2024 | 93 | MOTION for Summary Judgment filed by Michael F. Salvana, M.D.. Motion returnable before Judge Brenda K. Sannes. Response to Motion due by 5/28/2024. Reply to Response to Motion due by 6/4/2024 (Attachments: # 1 Declaration, # 2 Exhibit(s), # 3 Exhibit(s), # 4 Exhibit(s), # 5 Exhibit(s), # 6 Exhibit(s), # 7 Exhibit(s), # 8 Exhibit(s), # 9 Exhibit(s), # 10 Exhibit(s), # 11 Exhibit(s), # 12 Exhibit(s), # 13 Exhibit(s), # 14 Exhibit(s), # 15 Exhibit(s), # 16 Exhibit(s), # 17 Exhibit(s), # 18 Exhibit(s), # 19 Exhibit(s), # 20 Exhibit(s), # 21 Exhibit(s), # 22 Exhibit(s), # 23 Exhibit(s), # 24 Exhibit(s), # 25 Exhibit(s), # 26 Exhibit(s), # 27 Exhibit(s), # 28 Exhibit(s), # 29 Exhibit(s), # 30 Exhibit(s), # 31 Exhibit(s), # 32 Exhibit(s), # 33 Statement of Material Facts, # 34 Memorandum of Law) (de Oliveira, Carlo Alexandre) (Attachment 2 replaced on 5/9/2024) (khr, ). (Attachment 5 replaced on 5/9/2024) (khr, ). (Attachment 10 replaced on 5/9/2024) (khr, ). (Attachment 11 replaced on 5/9/2024) (khr, ). (Attachment 12 replaced on 5/9/2024) (khr, ). (Attachment 13 replaced on 5/9/2024) (khr, ). (Attachment 14 replaced on 5/9/2024) (khr, ). (Attachment 15 replaced on 5/9/2024) (khr, ). (Attachment 29 replaced on 5/9/2024) (khr, ). (Entered: 05/07/2024) |
| 05/08/2024 | | TEXT NOTICE OF FILING DEFICIENCY regarding the 93 MOTION for Summary Judgment filed by Michael F. Salvana, M.D.. Motion returnable before Judge Brenda K. Sannes. **NOTICE IS HEREBY GIVEN** of the following Filing Deficiency: Exhibits are missing pages. Attorney has been advised to file the corrected documents into the corrected document shell case - The correction(s) should be made within 3 days of this notice.<br><br>Notice of Filing Deficiency Deadline 5/10/2024 (sbb) (Entered: 05/08/2024) |
| 05/09/2024 | | CLERK'S CORRECTION OF DOCKET ENTRY re 93 Motion for Summary Judgment. A complete copy of Exhibits 1, 4, 9, 10, 11, 12, 13, 14 and 28 replaced. (khr) (Entered: 05/09/2024) |
| 05/09/2024 | 94 | AMENDED STATEMENT OF MATERIAL FACTS re 93 MOTION for Summary Judgment filed by Michael F. Salvana, M.D. Motion returnable before Judge Brenda K. Sannes. filed by Michael F. Salvana, M.D. (khr) (Entered: 05/09/2024) |
| 05/23/2024 | 95 | Letter Motion from Jorge A. Rodriguez, AAG for David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N. requesting extension of time to respond to motions submitted to Judge Miroslav Lovric, USMJ . (Rodriguez, Jorge) (Entered: 05/23/2024) |
| 05/23/2024 | 96 | Letter Motion from Carlo A. C. de Oliveira for Michael F. Salvana, M.D. requesting Extension of Time submitted to Judge Brenda K. Sannes . (de Oliveira, Carlo Alexandre) (Entered: 05/23/2024) |
| 05/28/2024 | 97 | TEXT ORDER: granting 95 and 96 Letters requesting Extension of Time as to the pending 92 , and 93 Motions for Summary Judgment. Responses are due by 6/18/2024, |

| | | |
|---|---|---|
| | | and Replies are due by 6/25/2024. SO ORDERED by Chief Judge Brenda K. Sannes on 5/28/2024. (nmk) (Entered: 05/28/2024) |
| 06/18/2024 | 98 | RESPONSE in Opposition re 93 Motion for Summary Judgment,,,,, filed by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. (Attachments: # 1 Declaration of Jorge A. Rodriguez, # 2 Statement of Material Facts in Response, # 3 Memorandum of Law in Opposition)(Rodriguez, Jorge) (Entered: 06/18/2024) |
| 06/18/2024 | 99 | MEMORANDUM OF LAW *in Opposition to Defendants' Motion for Summary Judgment* filed by Michael F. Salvana, M.D.. (Attachments: # 1 Statement of Material Facts Response, # 2 Exhibit(s) 32, # 3 Exhibit(s) 33)(Condit, Richard) (Entered: 06/18/2024) |
| 06/20/2024 | | TEXT NOTICE OF FILING DEFICIENCY: regarding the 99 Memorandum of Law. **NOTICE IS HEREBY GIVEN** of the following Filing Deficiency: Other Deficiency - Response is missing a required Affidavit. The Affidavit should be filed within 3 days of this notice.<br><br>Notice of Filing Deficiency Deadline 6/25/2024. (ham) (Entered: 06/20/2024) |
| 06/20/2024 | 100 | AFFIDAVIT / CERTIFICATE OF SERVICE re 99 Memorandum of Law by Michael F. Salvana, M.D.. (Condit, Richard) Modified on 6/21/2024 to clarify it is regarding Service and not an Affidavit in Response (ham). (Entered: 06/20/2024) |
| 06/25/2024 | 101 | REPLY to Response to Motion re 92 Motion for Summary Judgment,, filed by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. (Rodriguez, Jorge) (Entered: 06/25/2024) |
| 06/25/2024 | 102 | MEMORANDUM OF LAW re 99 Memorandum of Law *in Support of Plaintiff's Motion for Summary Judgment* filed by Michael F. Salvana, M.D.. (Attachments: # 1 Affidavit Certificate of Service)(de Oliveira, Carlo Alexandre) (Entered: 06/25/2024) |
| 08/30/2024 | 103 | MOTION for Leave to File *supplement to Motion for Summary Judgment* filed by Michael F. Salvana, M.D.. Response to Motion due by 9/20/2024 Motions referred to Miroslav Lovric. (Forsee, Andrea) (Entered: 08/30/2024) |
| 09/03/2024 | 104 | TEXT ORDER: granting 103 Letter requesting Leave to File a Supplemental Motion for Summary Judgment. The motion shall be filed in the form of a letter brief, not to exceed 5 pages in length, by 9/17/2024. Any responsive letter brief, not to exceed 5 pages in length, is due by 10/2/2024. A reply brief is not permitted. SO ORDERED by Chief Judge Brenda K. Sannes on 9/3/2024. (nmk) (Entered: 09/03/2024) |
| 09/17/2024 | 105 | LETTER BRIEF by Michael F. Salvana, M.D.. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B)(de Oliveira, Carlo Alexandre) (Entered: 09/17/2024) |
| 10/01/2024 | 106 | LETTER BRIEF *in response to Plaintiff's letter-motion [Dkt 105]* by David S. Dinello, M.D., Patricia Henderson, R.N., John Morley, M.D., Betty M. Parkmond, R.N.. (Rodriguez, Jorge) (Entered: 10/01/2024) |
| 02/11/2025 | 107 | TEXT ORDER: The parties are directed to appear for oral argument on the pending motions for summary judgment 92 , 93 on 3/4/25 at 10 a.m. The parties should be prepared to address whether Plaintiff's speech was protected speech and specifically whether his speech was "part-and-parcel of his concerns" about his ability to "properly execute his dut[y]," of ensuring high quality inmate health care. Weintraub v. Bd. Of Educ. of City School Dist. Of City of N.Y., 593 F.3d 196, 203 (2d Cir. 2010); (Dkt. No. 93-32, at 2). The clerk will provide counsel with a Microsoft Teams link to the hearing. SO ORDERED by Chief Judge Brenda K. Sannes on 2/11/2025. (nmk) (Entered: 02/11/2025) |

| 03/04/2025 | | TEXT Minute Entry for Oral Argument held on 3/4/2025 via video before Chief Judge Brenda K. Sannes re 92 and 93 Motions for Summary Judgment: After Questioning counsel and allowing supplemental arguments, the court reserves decision and will issue a written order shortly. Appearances: Carlo de Oliveria, Esq., Andrea Forsee, Esq., and Richard Condit, Esq. for plaintiff; Jorge Rodriguez, Esq. for defendants. (Court Reporter: Jodi Hibbard. Time: 10:00 a.m. - 10:43 a.m.) (nmk) (Entered: 03/04/2025) |
| --- | --- | --- |
| 03/06/2025 | 108 | MEMORANDUM-DECISION AND ORDER: It is hereby ORDERED that Plaintiff's motion for summary judgment (Dkt. No. 93 ) is DENIED. It is further ORDERED that Defendants' motion for summary judgment (Dkt. No. 92 ) is GRANTED and Plaintiff's amended complaint (Dkt. No. 38 ) is DISMISSED. It is further ORDERED that the Clerk is directed to close this case. Signed by Chief Judge Brenda K. Sannes on 3/6/2025. (nmk) (Entered: 03/06/2025) |
| 03/06/2025 | 109 | JUDGMENT: in favor of New York State Department of Corrections and Community Supervision, Betty M. Parkmond, R.N., Carl Koenigsmann, M.D., David S. Dinello, M.D., John Morley, M.D., and Patricia Henderson, R.N. against Michael F. Salvana, M.D. (nmk) (Entered: 03/06/2025) |
| 03/21/2025 | 110 | NOTICE OF APPEAL by Michael F. Salvana, M.D.. Filing fee $ 605, receipt number ANYNDC-7070282. (de Oliveira, Carlo Alexandre) (Entered: 03/21/2025) |
| 03/21/2025 | 111 | ELECTRONIC NOTICE AND CERTIFICATION sent to US Court of Appeals re 110 Notice of Appeal. (ham) (Entered: 03/21/2025) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 04/04/2025 12:51:18 | | |
| PACER Login: | ccdeoliveir7753 | Client Code: | 18694.002 |
| Description: | Docket Report | Search Criteria: | 5:21-cv-00735-BKS-ML |
| Billable Pages: | 16 | Cost: | 1.60 |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MICHAEL F. SALVANA, M.D.,

|                           |                         |
|---------------------------|-------------------------|
| Plaintiff,                | 5:21-cv-00735 (BKS/ML)  |

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
CARL KOENIGSMANN, M.D., JOHN MORLEY, M.D.,
DAVID S. DINELLO, M.D., PATRICIA HENDERSON,
R.N., BETTY M. PARKMOND, R.N.,

Defendants.

---

**Appearances:**

*For Plaintiff:*
Carlo Alexandre C. de Oliveira
Cooper Erving & Savage LLP
39 North Pearl St., 4th Fl.
Albany, NY 12207

Richard Condit
Desiree Langley
Mehri & Skalet, PLLC
2000 K Street, NW, Suite 325
Washington, DC 20006

*For Defendants:*
Letitia James
New York State Attorney General
Jorge A. Rodriguez
Assistant Attorney General, Of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Michael F. Salvana, M.D., a former Clinical Physician and Facility Health Services Director with the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action against DOCCS as well as former DOCCS Deputy Commissioner and Chief Medical Officer Carl Koenigsmann,[1] M.D.; current DOCCS Deputy Commissioner and Chief Medical Officer John Morley, M.D.; Regional Medical Director for Elmira and Oneida "HUBS" David S. Dinello, M.D.; DOCCS Deputy Superintendent for Health Services Patricia Henderson, R.N.; and DOCCS Nurse Director Betty M. Parkmond, R.N. (Dkt. No. 1, ¶¶ 8, 15–22, 31). Plaintiff raises a First Amendment retaliation claim and a Fourteenth Amendment Equal Protection claim under 42 U.S.C. § 1983, as well as claims for retaliation in violation of New York Labor Law § 741 and New York Civil Service Law § 75-b. (Dkt. No. 1, ¶¶ 158–93). Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, (Dkt. No. 22), and Plaintiff opposes the motion, (Dkt. No. 24). For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

## II.    FACTS[2]

### A.    Plaintiff's Role at DOCCS

DOCCS is the "New York State agency responsible for operating correctional facilities within" the state and is "responsible for the medical care of all inmates in its custody." (Dkt. No.

---

[1] Although Plaintiff sometimes refers to Defendant "Koeningsmann," (Dkt. No. 1, ¶¶ 108, 109, 113, 114, 116, 117), he is named in the caption and elsewhere as "Koenigsmann," (*id.* ¶¶ 15, 65, 67, 78, 80, 82).

[2] The facts are drawn from Plaintiff's complaint. (Dkt. No. 1). The Court assumes the truth of all well-pleaded facts and draws all reasonable inferences in Plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

1, ¶ 8). DOCCS is an accredited member of the American Correctional Association and the

National Commission on Correctional Health Care, both of which have "health care standards to

which they adhere." (*Id.* ¶¶ 9–10). DOCCS also "adheres to prison health care standards

published by the American Public Health Association." (*Id.* ¶ 11). However, prison hospitals in

New York State "are not overseen and regulated by the New York State Department of Health,"

except as to treatment of certain infectious diseases. (*Id.* ¶¶ 12–13). Thus, "[p]rison health care

workers are accountable only to DOCCS medical administration, which effectively creates its

own rules." (*Id.* ¶ 14).

At DOCCS, there are five Regional Medical Directors ("RMDs") and five Regional

Superintendents for Health Services ("Superintendents") who "oversee care in their designated

areas" and report to the DOCCS Deputy Commissioner or Chief Medical Officer. (*Id.* ¶ 20).

Each DOCCS prison also has a Facility Health Services Director ("Facility Director"), who

"serves as the prison's highest medical authority." (*Id.* ¶ 21). Facility Directors "report directly"

to Superintendents and "indirectly" to RMDs. (*Id.*).

Plaintiff began working as the Facility Health Services Director—Clinical Physician III

at Walsh Regional Medical Unit ("RMU") in 2014.[3] (*Id.* ¶ 31). Walsh RMU is a DOCCS

medical facility within the Mohawk Correctional Facility with "approximately 152 beds for the

most complicated and difficult cases . . . in the New York State correctional system." (*Id.* ¶ 33).

Each patient at Walsh RMU is assigned a medical team comprised of a clinician, nurses, and

other appropriate staff, who make decisions regarding the patient's treatment and care,

"including medication decisions." (*Id.* ¶ 34). As Facility Director, Plaintiff was "responsible for

---

[3] Plaintiff previously worked for DOCCS as a part-time physician at Mid-State Correctional Facility from 2003 to 2005, and at Walsh Regional Medical Unit as a "clinical physician II" from 2005 to 2011. (Dkt. No. 1, ¶¶ 28–29). He left DOCCS in 2011 due to the closure of Oneida Correctional Facility, and returned to Walsh RMU in 2014. (*Id.* ¶¶ 29–31).

overseeing all medical staff including doctors, nurse practitioners, nurses, physical and occupational therapists, radiology technicians, and the pharmacy supervisor," and he "supervis[ed] the treatment of 152 patients at Walsh RMU who had extreme medical pathology, some of whose medical histories exceeded 1,000 pages." (*Id.* ¶¶ 35, 100). Plaintiff and the physicians and nurses he supervised were "responsible for evaluating and performing scheduled examinations" of patients, referring patients outside for specialized treatment, and "prescribing, modifying, or declining the specialist-recommended medications." (*Id.* ¶¶ 36–37). "[P]rison physicians, such as [Plaintiff]" make decisions as to the "proper medical treatment [of] inmates," and "prescribe, modify, or decline medication based on their medical judgment and individualized assessment of the patients." (*Id.* ¶ 38). Moreover, as a physician, Plaintiff was "[g]uided by his *Hippocratic Oath* 'to do good or to do no harm,'" and had an "ethical responsibility not to discriminate against patients on the basis of personal or social characteristics relevant to their care, which includes incarceration status." (*Id.* ¶¶ 26–27).

### B.    The MWAP Policy

DOCCS physicians may prescribe medications listed in the DOCCS "Formulary Book" without approval from an RMD. (*Id.* ¶¶ 39–40, 42). To prescribe a medication not listed in the Formulary Book, physicians must submit a Non-Formulary Request to an RMD for approval. (*Id.* ¶ 40).

Defendant Dinello, as an RMD and Chairman of the DOCCS Pharmacy and Therapeutic Committee, was "empowered to institute policies and procedures and oversaw primary care guidelines for the medical providers of almost 50,000 patients." (*Id.* ¶ 64).[4] Defendant

---

[4] Plaintiff alleges that DOCCS gave Dinello these roles despite his lack of specialized training in addiction issues, and his guilty plea following charges in 2010 by the New York State Department of Health State Board of Professional Medical Conduct of "failing to adequately evaluate patients prior to discharge from an emergency room." (*See* Dkt. No. 1, ¶¶ 56–64).

Koenigsmann, who was then the DOCCS Deputy Commissioner and Chief Medical Officer, authorized Dinello to draft a new policy on Medications With Abuse Potential ("MWAPs"). (*Id.* ¶ 65). Dinello wrote a rough form of the policy in 2015, which Koenigsmann promulgated on June 2, 2017. (*Id.* ¶ 66). Koenigsmann then signed a revised version of the MWAP Policy on September 10, 2018. (*Id.* ¶ 67).

The MWAP policy placed certain medications—including medications that were previously listed in the Formulary Book—on the "MWAP list." (*Id.* ¶¶ 43, 45). This list included medications such as Ultram, Percocet, Oxycodone, Neurontin, Lyrica, and Baclofen, Flexeril, and Loperamide (commonly known as Imodium), the use of which may "engender some risk," but which DOCCS physicians had prescribed as appropriate despite awareness of the risk for decades. (*Id.* ¶¶ 46–53). If an RMD or prison physician is concerned about "diversion or misuse" of these medications, the clinician may have the patient monitored or request blood testing. (*Id.* ¶ 54). Plaintiff alleges that "all medications prescribed to patients in DOCCS' custody are administered by medical professionals and, thus, unlikely to be abused [and] are the only effective medication available for certain health conditions." (*Id.* ¶ 55).

Nonetheless, under the MWAP policy, providers had to "submit a one-page MWAP request form" to the RMD in charge of their "hub" to "get approval" to prescribe a medication on the MWAP list. (*Id.* ¶¶ 68–69). The Request Form asked for the patient's relevant health information, the "justification" for the use of the medication, a list of "alternatives" tried to treat the medical issue, and whether there was "any recent evidence of drug diversion or abuse by the patient." (*Id.* ¶¶ 70–71). When processing MWAP Request Forms, the RMDs only had access to "limited portions" of the patient's medical history from the Facility Health Services Database; from this Database, RMDs could not look up the patient's "daily treatment records" which were

"held with their primary provider," or their paper Ambulatory Health Record, which was kept at the facility where the patient was held. (*Id.* ¶¶ 72–74). The RMD then determined whether the patient received the MWAP medication; clinicians had "no ability to provide the medication once an RMD [had refused] to approve the prescription," and pharmacies would not fill MWAP prescriptions without RMD approval. (*Id.* ¶¶ 75–77).

Plaintiff alleges that Koenigsmann has testified elsewhere that the RMDs felt strongly that the MWAP policy needed to be a "policy" as opposed to a "practice guideline" because "[a] policy requires adherence." (*Id.* ¶ 78). In an internal DOCCS email, Koenigsmann wrote to Dinello that they needed to be "extremely careful about indicating that anyone [was] having their medication discontinued because of a new policy," as changing medications based on a policy would be "doomed to [legal] failure." (*Id.* ¶¶ 80–81). He also noted that he held reservations about creating a guideline versus a policy because "it's difficult with licensed clinicians to dictate how they provide care," but under the MWAP policy, "we do require that they have to prove certain things before they're able to prescribe these medications, and that's different from out in the free world" where there are "no similar limitations on providers." (*Id.* ¶ 81). He added that the MWAP policy was "never designed to eliminate any specific" medication or class of medications, but only to "ensure that we have proper oversight over the clinicians ordering the medications." (*Id.* ¶ 82).

However, the MWAP policy "had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates that need[ed] MWAPs, including patients who suffer[ed] from epileptic seizures, Multiple Sclerosis, cancer, sickle-cell anemia crisis, phantom pain, major spinal injuries, and other sources of chronic pain." (*Id.* ¶ 83). Plaintiff alleges that medical records show "consistent patterns of medical providers fighting the RMDs when their

patients [were] denied recommended and effective MWAP medications." (*Id.* ¶ 84). On

December 26, 2017, Dinello gave an "informal warning" to clinicians that a "formal warning"

would be issued if the MWAP policy "was not followed." (*Id.* ¶ 85). Following the promulgation

of the MWAP policy on June 2, 2017, RMDs "repeatedly and systematically refused the

prescription or re-prescription of MWAPs to patients in desperate need of medications to

effectively treat chronic pain and nerve issues," without regard for the recommendations of

treating providers or the patient's medical needs. (*Id.* ¶ 86).

Plaintiff alleges that "[a]s implemented, the MWAP policy [was] an almost wholesale

restriction on the prescription of MWAPs," and that such a ban on medications "does not

comport with the standards adopted by other prison systems or the Standard of Medical Care in

the community." (*Id.* ¶ 87). According to Plaintiff, incarcerated patients have higher-than-

average prevalence of disease, substance use disorders and psychiatric illness, and major spinal

cord injuries, and treatment protocols are "necessarily different" in prisons because non-medical

treatments may not be readily available. (*Id.* ¶¶ 94–96). Therefore, "pharmaceuticals . . . may

take on an even greater therapeutic importance in prisons." (*Id.* ¶ 97).

### C.   Opposition to the Policy

After the enactment of the MWAP policy, "many patients were denied medications that

effectively treated their serious pathologies and had been previously prescribed by their treating

doctor." (*Id.* ¶ 102). Medical providers at Mohawk Correctional Facility and Walsh RMU "who

were similarly situated to [] Plaintiff opposed the MWAP policy and challenged decisions made

under the policy that adversely impacted their patients"; for example, the Mohawk Clinic

Director "expressed concerns on a number of occasions," "frequently contested the application

of the MWAP policy to medications that he deemed appropriate for his patients," and "attended

meetings with Plaintiff and DOCCS managers to discuss the MWAP policy." (*Id.* ¶¶ 103–104).

Doctors and nurse practitioners who worked with Plaintiff at Walsh RMU also "contested application of the MWAP policy to their patients," "attended meetings concerning the policy," and "otherwise complained about the policy." (*Id.* ¶ 105). However, neither the Mohawk Clinic Director nor the other doctors or providers working at Walsh RMU "were subjected to the intensity of harassment, hostility, and abuse" that Plaintiff suffered; Plaintiff alleges that he was "singled out and intentionally and maliciously treated differently than the other medical providers." (*Id.* ¶ 106). Nonetheless, Plaintiff "challenged the Defendants in an effort to protect the rights of Walsh RMU patients." (*Id.* ¶ 107).

Plaintiff opposed the MWAP Policy "from its inception because it prevented him and other doctors from providing the proper quality of care to inmates under DOCCS custody." (*Id.* ¶ 99). On or around July 7, 2017, Plaintiff wrote an email to Koenigsmann, "expressing his concerns that enforcing the MWAP policy would likely result in litigation and ethical complaints to the Board of Medical Examiners," and asking that patients at Walsh RMU be "exempted." (*Id.* ¶ 108). Koenigsmann "concurred" with his concerns but denied his request that patients at Walsh RMU be exempt. (*Id.* ¶ 109).

In July 2017, Plaintiff "sent a letter to Mohawk Correctional Facility Superintendent Paul Gonyea outlining his concerns with the implementation of the MWAP policy." (*Id.* ¶ 110). Plaintiff wrote that the policy "interfered with proper patient care, caused patients to undergo needless tests and consultations, and created a potential for liability due to the resulting poor patient care." (*Id.*). On or around July 28, 2017, Gonyea forwarded the letter to Associate Commissioner and Executive Assistant Charles F. Kelly, Jr. and to then-Acting Commissioner Anthony J. Annucci "asking that [Plaintiff's] concerns be brought to the Commissioner's attention." (*Id.* ¶ 111).

On or around August 9, 2017, Dinello, Defendant Henderson, Statewide Director of

Pharmacy Services Mary E. Koury, R.Ph, and Plaintiff met to "discuss [Plaintiff's] concerns

with the MWAP policy." (*Id.* ¶ 112). During the meeting, the following concerns "were raised":

> a. the policy undermined the professional judgment of doctors
> already treating inmates and who were familiar with the inmates'
> medical history and recommended treatments;
>
> b. the policy created a potential for litigation because it denied
> necessary medication to patients after it had been recommended and
> approved by other medical specialists;
>
> c. [n]urses and pharmacists were concerned with the lag of time
> between MWAP approval and when medication could be
> administered due to the additional paperwork required by the
> MWAP policy;
>
> d. the MWAP policy was not appropriate for [] treating the
> chronically ill patients at Regional Medical Units because it allowed
> for the denial of necessary medication that had already been
> previously approved for the patients[; and]
>
> e. [d]octors were refusing to comply with the MWAP at the various
> RMUs due to concerns that it violated their ethical obligations to
> their patients and that it constituted improper patient care.

(*Id.*). Between August and November, Plaintiff wrote to Koenigsmann that the "MWAP policy at

Mohawk Correctional Facility and Walsh RMU continued to create significant problems in the

management of patients and in administering proper community standards of care," specifically

that "necessary medication was denied to patients even after additional information about the

need for medication was provided by neurologists and oncologists." (*Id.* ¶ 114). Plaintiff wrote

that the policy was "resulting in unnecessary patient suffering," providing specific examples of

patients who were denied MWAP medications: (1) Dinello denied Neurontin to a patient with

neuropathy, and told a Nurse Practitioner to use Cymbalta, which did not work; (2) Gabapentin

was denied to a patient with spinal fusion; (3) Dinello denied Neurontin to a patient with

epilepsy, who had two episodes of seizures while being weaned off the medication, resulting in ER visits; (4) Plaintiff's requests for Morphine and Neurontin for a patient with necrosis, neuropathy, joint disease, and sickle cell anemia were denied, and the patient "came close to death" due to complications from a sickle cell crisis, yet Dinello "continued to state [that] . . . they are getting away from using opioids on [sickle cell] patients"; (5) Morphine and Percocet were denied to a patient with severe spinal stenosis and headaches post-pituitary adenoma resection; (6) Clonazepam was denied to a paraplegic patient with episodes of "severe Myoclonus," which "continues"; and (7) Percocet was denied to a wheel-chair-bound patient with HIV and degenerative disc disease. (*Id.* ¶ 115).

On November 1, 2017, Plaintiff, Koenigsmann, and Dinello met to discuss Plaintiff's concerns with the MWAP policy. (*Id.* ¶ 116). At this meeting, Plaintiff "discussed how the MWAP policy was preventing him from providing standard medical care to a number of chronically ill patients." (*Id.*). On January 18, 2018, Plaintiff "discussed his ongoing concerns with the MWAP policy" on a phone call with Koenigsmann and Dinello. (*Id.* ¶ 117). Nonetheless, "Defendants continued to enforce the MWAP policy and to deny necessary medication to numerous patients with painful pathologies and severe neurologic sequelae." (*Id.* ¶ 118).

In January 2018, Henderson was "appointed Deputy Superintendent for Health Services and became [Plaintiff's] immediate supervisor." (*Id.* ¶ 119). Soon thereafter, "numerous patients" filed complaints with DOCCS' Commissioner and took legal action against DOCCS relating to the MWAP policy. (*Id.* ¶ 120).

In June 2019, a patient suffering from apparent malignant sarcoma in his brain, which can cause irrational and delusional behavior, began exposing himself to nursing staff, pulled a

showerhead out of the wall, and broke a water pipe. (*Id.* ¶ 121). The Correctional Emergency

Team was summoned to restrain him, and Plaintiff ordered an MWAP medication to sedate him

and prevent injuries to staff or the patient. (*Id.*). Henderson, who is not a physician, opposed the

emergency use of this MWAP medication, and ordered the responding nurse not to administer it.

(*Id.*). Shortly thereafter, the patient broke through the metal reinforced plexiglass window of a

holding room with his fist and attacked a correctional officer, causing permanent injuries. (*Id.*).

The next day, Plaintiff emailed Dinello and Defendant Morley regarding Henderson's "decision

to cancel [his] prescribed treatment." (*Id.* ¶ 122). Henderson then "locked [Plaintiff] out of the

facility, demanding that he go to her office, where she berated him for prescribing a[n] MWAP

medication and then filing a complaint about her." (*Id.*).

In mid-2019, Henderson and Defendant Parkmond "ordered nurses to withhold assistance

from [Plaintiff] for several patients" "as a result of [his] continued opposition to the MWAP

policy." (*Id.* ¶ 123). For example, Henderson did not allow a patient with hemophilia to self-

administer his medication. (*Id.* ¶ 125). Plaintiff ordered that the patient be permitted to self-

administer his medication, which he had been allowed to do, and when Henderson found out, she

ordered the nurses to "stop assisting [Plaintiff] to treat this patient." (*Id.* ¶¶ 124, 126–27).[5]

Plaintiff requested approval to prescribe Marinol to a quadriplegic patient with gastro-esophageal

reflux, who often vomited while lying on his back making him "susceptible to aspiration,

choking, and asphyxiation." (*Id.* ¶¶ 129–31). On multiple occasions, Plaintiff had sent this

patient to the hospital for dehydration due to vomiting, and Marinol was the "only medication

that controlled" it. (*Id.* ¶¶ 130–31). Dinello denied his request. (*Id.* ¶ 131). Fearing that without

medication to control his vomiting the patient would need immediate medical assistance if he

---

[5] Plaintiff documented this incident in a September 30, 2019 letter to Morley. (*Id.* ¶ 128).

began to vomit and choke, Plaintiff asked that the patient's room be unlocked. (*Id.* ¶ 132).

Dinello and Henderson denied that request, and Henderson prohibited Plaintiff from treating the

patient and ordered correctional officers to prohibit Plaintiff from entering the patient's room.

(*Id.* ¶¶ 132–33). Henderson also ordered nurses to give a patient with multiple sclerosis only one

catheter, which would need to be washed before re-insertion. (*Id.* ¶¶ 134–35). Plaintiff had

written an order that the patient should have at least six catheters available to him each day,

because re-using catheters creates an increased risk of infection and is not consistent with

standard medical care. (*Id.* ¶¶ 135–36). Henderson ignored this order and directed nurses to only

give the patient one catheter, "disregard[ing]" Plaintiff's "recommended treatment." (*Id.* ¶¶ 134–

35, 137).

Henderson and Dinello "continued to deny [Plaintiff's] request[s] for medication for his

patients and to cancel prescriptions he ordered to treat chronically ill patients." (*Id.* ¶ 138). On

"numerous occasions," including in or around July 2019, Henderson called Plaintiff into her

office to tell him to stop writing letters to the DOCCS Commissioner and Chief Medical Officer

about the MWAP policy and other concerns. (*Id.* ¶ 139).

### D.   Plaintiff's Departure from Walsh RMU

Since the implementation of the MWAP policy, Plaintiff "struggled to insure [sic]

medically necessary care for many critically ill patients," and on "many occasions," his treatment

plans, and those of other doctors that served with him, were "materially interfered with or denied

by the Defendants." (*Id.* ¶ 140). He observed "unnecessary suffering and inhumane treatment,"

his efforts to improve quality of care for patients were "attacked," and he was subject to

"constant hostility and anger." (*Id.*).

Plaintiff felt that his working conditions had become "intolerable." (*Id.*). In late

September 2019, Plaintiff asked Dinello about transferring to Five Points Correctional Facility.

(*Id.* ¶ 141). However, when he learned that Five Points was a two-hour drive from his house, he "decided instead to take a leave of absence from his employment with DOCCS." (*Id.* ¶ 142). While on leave, he learned that a doctor at Cayuga Correctional Facility—which was only 40 minutes away from his home—was going to retire, and in November 2019, he contacted Morley and Dinello and told them that he wanted to apply for the physician position at Cayuga once it was posted. (*Id.* ¶¶ 143–44). Morley told Plaintiff that he should accept an appointment at Southport Correctional Facility while he waited for the Cayuga position to open, at which point he could transfer. (*Id.* ¶ 145). He recommended that Plaintiff send his resume to the Superintendent at Cayuga in the meantime, and Plaintiff did so. (*Id.*). Morley told Plaintiff that "the only way [he would] not get the job in Cayuga [was] if the Superintendent's son want[ed] it," but because the Superintendent's son was not a doctor, Plaintiff "felt confident that he would be transferred to [Cayuga] very soon." (*Id.* ¶ 147).

Plaintiff's commute to Southport was a four-hour roundtrip, which was "treacherous and dangerous" in the winter. (*Id.* ¶ 146). While working at Southport, Plaintiff learned that the physician position at Cayuga had become vacant, and that he had not been notified. (*Id.* ¶ 148). On February 24, 2020, Plaintiff wrote to Morley that he had inquired about replacing the retiring doctor at Cayuga, and that the Superintendent had failed to respond to his letter of interest. (*Id.* ¶ 150). He filed a Reassignment Request Form with the Director of Human Resources in Albany on February 27, 2020, "stating that he wanted to be transferred to Cayuga" when the position became available. (*Id.* ¶ 151). Plaintiff also wrote to Dinello that day expressing interest in applying for the position at Cayuga and asking when it would be posted. (*Id.* ¶ 152). On March 5, 2020, Dinello wrote to Plaintiff that the position at Cayuga had been changed from a doctor to

a nurse practitioner, and it was ultimately assigned to a family practice per diem nurse
practitioner, even though the facility had no internal medicine physician. (*Id.* ¶¶ 149, 153).

Plaintiff then realized that it would be "nearly impossible for him to continue working as
a correctional physician," and because he could "no longer endure the hostility and difficult
circumstances," he was "forced to prematurely retire from public service." (*Id.* ¶ 154). Four
weeks later, Dinello posted for a doctor's position at Cayuga. (*Id.* ¶ 155). Plaintiff did not learn
about the posting until November 2020, after the position had been filled; even though DOCCS
"routinely invited doctors in retirement to return to work," Defendants never contacted Plaintiff
about his interest in applying. (*Id.* ¶¶ 156–57).

## III.    DISCUSSION

### A.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a
complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'"
*Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell
Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations
sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S.
at 555). The Court must accept as true all factual allegations in the complaint and draw all
reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir.
2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).
However, "the tenet that a court must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    Sovereign Immunity

Defendants first argue that the Eleventh Amendment bars Plaintiff's § 1983 claims
against DOCCS under the doctrine of sovereign immunity. (Dkt. No. 22-1, at 8–9). The Court

14

agrees. Sovereign immunity bars a suit in federal court against a state, absent the state's consent to suit or congressional abrogation of immunity. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996); *Kostok v. Thomas*, 105 F.3d 65, 68 (2d Cir. 1997). "New York has not waived its immunity, nor has Congress abrogated it." *Jackson v. Ramirez*, 691 F. App'x 45, 46 (2d Cir. 2017) (summary order) (first citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39 (2d Cir. 2017); and then citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)); *see also Walker v. NYS Justice Ctr. for the Prot. of People with Special Needs*, 493 F. Supp. 3d 239, 246 (S.D.N.Y. 2020) ("Congress did not abrogate the States' sovereign immunity when it enacted §§ 1983 and 1985, and New York has not waived its immunity." (citing, inter alia, *Mamot v. Bd. of Regents*, 367 F. App'x 191, 192 (2d Cir. 2010))). "DOCCS, as an arm of the state, stands in the same position as the State of New York." *White v. New York*, No. 19-cv-0543, 2019 WL 2578270, at *1, 2019 U.S. Dist. LEXIS 105272, at *2 (S.D.N.Y. June 24, 2019) (citing *Bryant v. N.Y. State Dep't of Corr. Servs. Albany*, 146 F. Supp. 2d 422, 426 (S.D.N.Y. 2001)). Thus, the § 1983 causes of action against DOCCS are dismissed.[6]

### C.   First Amendment Retaliation

Plaintiff alleges that Defendants retaliated against him for engaging in protected First Amendment speech. (Dkt. No. 1, ¶¶ 168–79). Defendants move to dismiss Plaintiff's First Amendment retaliation claim on the grounds that: (1) Plaintiff's speech was not constitutionally protected; (2) there was no adverse action; (3) there was no causal connection between any protected speech and any alleged adverse action; and (4) Plaintiff has failed to plead the personal

---

[6] It is not clear why Plaintiff argues that his claims may proceed against state officials in their official capacities, (Dkt. No. 24, at 12), because he has not alleged any official capacity claims; nor has he alleged any ongoing violation of federal law for which an official could provide prospective relief. *See Deposit Ins. Agency v. Superintendent of Banks (In re Deposit Ins. Agency)*, 482 F.3d 612, 618 (2d Cir. 2007). The Court therefore need not address this argument.

involvement of several Defendants. (Dkt. No. 22-1, at 9–23). Plaintiff responds that he has

sufficiently alleged the elements of a First Amendment retaliation claim. (Dkt. No. 24, at 13–23).

"To survive a motion to dismiss, a plaintiff claiming that he was retaliated against in

violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity

that was protected by the First Amendment; (2) he suffered an adverse employment action; and

(3) a causal connection existed between the adverse action and the protected activity." *Specht v.

City of New York*, 15 F.4th 594, 599–600 (2d Cir. 2021) (citing *Smith v. County of Suffolk*, 776

F.3d 114, 118 (2d Cir. 2015)).

### 1.      Protected Speech

"The speech of a public employee is protected by the First Amendment when the

employee speaks as a citizen on a matter of public concern, rather than pursuant to his

employment responsibilities." *Specht*, 15 F.4th at 600 (citing *Garcetti v. Ceballos*, 547 U.S. 410,

420–21 (2006)). Thus, as a public employee, Plaintiff must allege that he "engaged in citizen

speech," in other words, that he "spoke as a private citizen," and that "the speech at issue was on

a matter of public concern." *See Montero v. City of Yonkers, New York*, 890 F.3d 386, 399 (2d

Cir. 2018); *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

### a.      Matter of Public Concern

Defendants argue that Plaintiff did not speak on a "matter of public concern" because his

speech "concerned only the impacts of the MWAP policy on his ability to perform his duties and

his professional reputation," which are "personal concerns and grievances related to [his]

employment and interactions with coworkers." (Dkt. No. 22-1, at 12–13). Plaintiff responds that

his speech "revolved around" a matter of public concern, as his opposition to the MWAP policy

was "motivated by his desire to protect all patients' welfare and a desire to correct the state's

wrongdoing," not a desire to "protect his job or reputation," and that the "public concern that was

the subject of [his speech] was the unethical medical care and the inhumane treatment of patients within the New York prison system." (Dkt. No. 24, at 15).

"Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement." *Specht*, 15 F.4th at 600 (citing *Montero*, 890 F.3d at 399). "Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). As the Second Circuit has explained:

> To identify matters of public concern, "we consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large[.]"

*Id.* (quoting *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)).

The Court concludes that Plaintiff has plausibly alleged that he spoke on a matter of public concern.[7] Plaintiff alleges that he complained to DOCCS officials that the MWAP policy "would likely result in litigation and ethical complaints to the Board of Medical Examiners," (Dkt. No. 1, ¶ 108); "interfered with proper patient care, caused patients to undergo needless tests and consultations, and created a potential for liability due to the resulting poor patient care,"

---

[7] The complaint contains instances of speech where the allegations do not make clear whether Plaintiff spoke, or the content or context of the speech. (*E.g.*, Dkt. No. 1, ¶¶ 112 (concerns about the MWAP policy "were raised"), 117 (Plaintiff "discussed his ongoing concerns with the MWAP policy"), 123 (Henderson ordered nurses to withhold assistance from Plaintiff because of his "continued opposition" to the policy), 139 (Henderson told Plaintiff to stop writing letters about the MWAP policy)). The Court cannot determine from the allegations whether these instances of speech are protected. *See Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 275 (W.D.N.Y. 2013) (finding the plaintiff's allegations "unacceptably vague" in that they provided "scant detail as to the content of the speech" and did not "indicate to whom the speech was directed, the nature of the forum in which the speech was made, or when the instances of protected speech occurred"). Moreover, Plaintiff has not plausibly alleged that his September 2019 letter regarding his dispute with Henderson over the treatment of a hemophiliac patient had any relation to the MWAP policy or otherwise touched on a matter of public concern. (Dkt. No. 1, ¶¶ 127–28); *see Coward v. Gilroy*, No. 05-cv-285, 2007 WL 1220578, at *6, 2007 U.S. Dist. LEXIS 30075, at *18–20 (N.D.N.Y. Apr. 24, 2007) (finding that statements which were "specific and personal in nature" and related only to the treatment of one consumer were not of public concern).

17

(*id.* ¶ 110); created "significant problems in the management of patients and in administering

proper community standards of care" and caused "unnecessary patient suffering," (*id.* ¶¶ 114–

15); and was "preventing him from providing standard medical care to a number of chronically

ill patients," (*id.* ¶ 116).

In *Dillon v. Suffolk County Department of Health Services*, the district court found that

when a doctor at a correctional facility complained, inter alia, that medications were not being

properly prescribed and administered and "injured and acutely ill patients were being neglected

and left untreated," there was "no doubt" that her speech was of public concern, because "[t]hese

incidents, the inadequacy of training and care within the facility, and the lack of a response to

reported conditions implicate the health, welfare and safety of . . . individuals in the care of the

state, [and] are matters of importance to the public." 917 F. Supp. 2d 196, 208 (E.D.N.Y. 2013)

(quoting *McLaughlin v. Pezzolla*, No. 06-cv-0376, 2010 WL 56051, at \*9, 2010 U.S. Dist.

LEXIS 232, at \*30 (N.D.N.Y. Jan. 4, 2010)). Similarly, Plaintiff's complaints about the MWAP

policy went beyond its "interference with his ability to perform his job duties and the impact it

may have on his professional reputation," as Defendants argue, (Dkt. No. 22-1, at 13), and

extended to its effect on the health and safety of all patients, not just his own, as well as its

potential to expose DOCCS to litigation and ethical complaints, which are matters of public

concern. *See, e.g.*, *DiMarco v. Rome Hosp.*, No. 88-cv-1258, 1991 WL 336000, at \*1, \*8, 1991

U.S. Dist. LEXIS 16603, at \*3, \*24 (N.D.N.Y. June 29, 1991) (finding complaints raising

"questions about . . . the professional conduct and medical judgment of several of his colleagues

and the nursing staff, the Hospital's overall patterns and practices, and the leadership and

competence of those individuals who were responsible for managing the Hospital" were matters of public concern).[8]

### b.      Speaking as a Private Citizen

When determining whether a public employee spoke as a private citizen, courts ask two questions: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" *Matthews*, 779 F.3d at 173 (citing *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203–04 (2d Cir. 2010)). Within this inquiry, "[a]lthough the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, '[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" *Montero*, 890 F.3d at 397–98 (2d Cir. 2018) (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)).

### i.      Official Responsibilities

Courts have adopted a "functional approach" to assessing whether speech falls outside of an employee's official responsibilities, focusing on the employee's "actual, functional job responsibilities." *See Matthews*, 779 F.3d at 173–74. Because of the fact-intensive nature of this inquiry, it is not subject to a bright-line rule: courts look to "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* at 173 (quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012)).

---

[8] Defendants cite several cases in which courts noted that speech does not relate to a matter of public concern when the speech is "calculated to redress personal grievances," *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020), seeks to "vindicate personal interests," *Nagle v. Fried*, No. 07-cv-2860, 2010 WL 8917844, at *5, 2010 U.S. Dist. LEXIS 144983, at *15 (S.D.N.Y. Mar. 17, 2010), *vacated sub nom. Nagle v. Marron*, 663 F.3d 100 (2d Cir. 2011), or concerns a "change in the employee's own duties," *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011). (Dkt. No. 22-1, at 11–12). As discussed above, Plaintiff's speech extended beyond personal grievances and interests or a change in his own duties.

Moreover, because the nature of this inquiry is so "fact intensive and context specific," courts often decline to determine whether speech was part of an employee's job duties at the motion to dismiss stage. *See Schultz v. County of Suffolk*, No. 19-cv-0925, 2020 WL 7699944, at *6, 2020 U.S. Dist. LEXIS 164506, at *16–17 (E.D.N.Y. Sept. 4, 2020), *report and recommendation adopted*, 2020 WL 7041090, 2020 U.S. Dist. LEXIS 224667 (E.D.N.Y. Nov. 30, 2020); *see also Buchanan v. City of New York*, 556 F. Supp. 3d 346, 357 (S.D.N.Y. 2021) (collecting cases, and noting that "district courts frequently deny as premature pre-discovery motions to dismiss on the grounds that the plaintiff spoke as an employee").

In *Matthews*, a police officer informed precinct commanding officers that a precinct-wide quota system was "causing unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers" and "was having an adverse effect on the precinct's relationship with the community." 779 F.3d at 169 (quotation marks omitted). The Second Circuit found that the officer spoke as a private citizen, because policy-oriented speech was "neither part of his job description nor part of the practical reality of his everyday work"; his job did not involve reporting misconduct or commenting on precinct-wide policy, and he had "no role in setting policy" nor was he "expected to speak on policy" or "consulted on formulating policy." *Id.* at 174. Moreover, he did not regularly communicate with these commanding officers beyond "hallway small talk." *Id.* Thus, because the officer's "actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders," and his speech was neither what he was employed to do, nor "'part-and-parcel' of his regular job," the Second Circuit found that he spoke as a private citizen:

> We hold that when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that

> implicates a matter of public concern engages in speech concerning
> that policy, and does so in a manner in which ordinary citizens
> would be expected to engage, he or she speaks as a citizen, not as a
> public employee.

*Id.*; *see also Buchanan*, 556 F. Supp. 3d at 358–59 (denying motion to dismiss for lack of citizen

speech where plaintiffs, employees of the Civilian Complaint Review Board ("CCRB"),

allegedly wrote to CCRB officials challenging "high-level CCRB policies and practices relating

to [body camera] footage" because the plaintiffs had not conceded that "their day-to-day work

involved high-level policy formation and implementation, let alone the formulation and

implementation of the specific policies at issue"); *Gusler v. City of Long Beach*, No. 10-cv-2077,

2016 WL 11493644, at *19 (E.D.N.Y. Aug. 4, 2016)[9] (finding when a fire department lieutenant

wrote to the City Manager questioning decisions by the chief, he was speaking as a citizen,

because the record evidence did not suggest that "the plaintiff's duties included complaining

about his supervisors, accusing them of misconduct, or sharing his views on fire department

policy," and he had "no role in setting policy").

Here, Plaintiff alleges that, as Facility Director at Walsh RMU, he was "the prison's

highest medical authority," (Dkt. No. 1, ¶ 21), and that his duties included "overseeing all

medical staff including doctors, nurse practitioners, nurses, physical and occupational therapists,

radiology technicians, and the pharmacy supervisor," and supervising "the treatment of 152

patients at Walsh RMU who had extreme medical pathology," (*id.* ¶¶ 35, 100). Plaintiff and the

doctors and nurses he supervised were also "responsible for evaluating and performing scheduled

examinations" of patients, referring patients outside for specialized treatment, and "prescribing,

modifying, or declining the specialist-recommended medications." (*Id.* ¶¶ 36–37). As Facility

---

[9] No LEXIS cite available.

Director, Plaintiff reported directly to Superintendent and indirectly to the RMD. (*Id.* ¶ 21). The Superintendent and RMD, in turn, reported to the Deputy Commissioner or Chief Medical Officer. (*Id.* ¶ 20).

Plaintiff does not allege that any of his duties as Facility Director involved formulating, implementing, or providing feedback on DOCCS-wide policies such as the MWAP policy. *See Matthews*, 779 F.3d at 174. Rather, Plaintiff alleges that Dinello was "empowered to institute policies and procedures" and drafted the MWAP policy, (Dkt. No. 1, ¶¶ 64–65), and does not allege that he was consulted during this process.

Defendants note that Plaintiff complained solely "internally to supervisors within his chain of command." (Dkt. No. 22-1, at 12). However, as Plaintiff notes, while the fact that a statement was made internally may be relevant in determining whether the employee spoke as a citizen or employee, it is not dispositive. *See, e.g., Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 465 (D. Conn. 2016) ("[A]n employee may be considered to be speaking as a citizen even though the speech is to a supervisor, relates to her employment, and was spoken in the workplace." (citation omitted)). Moreover, Plaintiff made several of his complaints regarding the MWAP policy directly to Koenigsmann, who was then Chief Medical Officer, (*see* Dkt. No. 1, ¶¶ 108, 114, 116); there is no indication that Plaintiff reported to Koenigsmann or regularly communicated with Koenigsmann or that doing so was part of his job responsibilities. *See Matthews*, 779 F.3d at 174.

Defendants also argue that Plaintiff's speech "concerned only the impacts of the MWAP policy on his ability to perform his duties and his professional reputation." (Dkt. No. 22-1, at 12). *See, e.g., Weintraub*, 593 F.3d at 203 (holding that a teacher's grievance with his union regarding his supervisor's failure to discipline a student was "'pursuant to' his official job duties because it

22

was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties'" (citation

omitted)). However, as discussed above, the Second Circuit has held that "when a public

employee whose duties do not involve formulating, implementing, or providing feedback on a

policy that implicates a matter of public concern engages in speech concerning that policy, and

does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as

a citizen, not as a public employee." *Matthews*, 779 F.3d at 174. Thus, the Court finds that

Plaintiff has plausibly alleged that his speech fell outside his official responsibilities.

### ii.  Civilian Analogue

"Speech has a 'relevant civilian analogue' if it is made through 'channels available to

citizens generally.'" *Matthews*, 779 F.3d at 175 (quoting *Jackler*, 658 F.3d at 238). In *Matthews*,

the Second Circuit found that a police officer's speech had a civilian analogue when, rather than

going through formal internal grievance procedures, he "went directly to the Precinct

commanders, with whom he did not have regular interactions and who had an open door to

community comments and complaints." *Id.* at 176. The Court noted that these Precinct

commanders attended monthly Community Council meetings, met with members of the

community, and "regularly heard civilian complaints about Precinct policing issues." *Id.*; *see

also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 509–10 (S.D.N.Y. 2015) (finding on

summary judgment that an NYPD officer's speech had a civilian analogue when he spoke at a

performance evaluation and appeal meeting, but also with the Internal Affairs Bureau and

Quality Assurance Division, noting that any citizen can report wrongdoing to the IAB, and that it

was not clear from the record whether the public can report to the QAD, which would "remain a

question for trial"); *cf. Weintraub*, 593 F.3d at 204 (finding a teacher's speech was not protected

when she lodged a union grievance, which is not a channel available to non-employees).

Here, Plaintiff alleges that he emailed, met with, wrote letters to, and spoke on the phone with various DOCCS officials, including Superintendent Gonyea, RMD Dinello, and Chief Medical Officer Koenigsmann. Plaintiff does not allege whether members of the public could engage in these methods of communication with DOCCS officials, and his allegations suggest that each of these officials were within his chain of command. (*See* Dkt. No. 1, ¶¶ 20–21 (explaining the Facility Directors report to Superintendents and RMDs, who report to the Deputy Commissioner or Chief Medical Officer)); *see also Calvelos v. City of New York*, No. 19-cv-6629, 2020 WL 3414886, at *14, 2020 U.S. Dist. LEXIS 109266, at *40 (S.D.N.Y. June 22, 2020) (finding that "intra-facility complaints to the command staff" by a corrections officer lacked a civilian analogue); *Flynn v. N.Y. State Dep't of Corr.*, No. 17-cv-2864, 2018 WL 2041713, at *6, 2018 U.S. Dist. LEXIS 72277, at *15–16 (S.D.N.Y. Apr. 30, 2018) (rejecting plaintiff's argument that her complaints were "outside of the chain of command" because the official she complained to was "several levels above [her] at DOCCS," because the official did not "entertain[] complaints from private citizens"); *Ross*, 693 F.3d at 307 ("Taking a complaint up the chain of command to find someone who will take it seriously 'does not, without more, transform [his] speech into protected speech made as a private citizen.'" (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011))).

Thus, at this stage, Plaintiff has not plausibly alleged that he spoke through a channel available to citizens generally. However, "the lack of a civilian analogue [i]s not critical to a decision as to whether [Plaintiff] spoke as a private citizen," as the critical question is whether the speech at issue itself was ordinarily within the scope of an employee's duties. *See Montero*, 890 F.3d at 397–98 (quoting *Lane*, 573 U.S. at 240); *Ross*, 693 F.3d at 307 ("Speech to a supervisor even in the workplace can be protected as that of a private citizen if it is not made

pursuant to the employee's official duties as an employee."). Therefore, although Plaintiff has

not plausibly alleged that his speech lacked a civilian analogue, at this early stage of the case, the

Court finds that he has plausibly alleged that he spoke outside of his official duties on a matter of

public concern, and thus plausibly alleged that he engaged in protected speech.

### 2.    Adverse Action

Defendants argue that Plaintiff has not alleged that any of the actions taken by

Defendants constituted adverse actions. (Dkt. No. 22-1, at 14–18). Plaintiff responds that he has

plausibly pled the adverse action of constructive discharge. (Dkt. No. 24, at 16–19).

"For purposes of the First Amendment, an 'adverse employment action' is one that

'would deter a similarly situated individual of ordinary firmness from exercising his or her

constitutional rights[.]'" *Specht*, 15 F.4th at 604 (quoting *Dawes v. Walker*, 239 F.3d 489, 493

(2d Cir. 2001)). "[The] test for determining whether an employer has taken adverse action is not

wooden: it must be 'tailored to the different circumstances in which retaliation claims arise.'" *Id.*

(first citing *Dawes*, 239 F.3d at 493, and then citing *Cox v. Warwick Valley Cent. Sch. Dist.*, 654

F.3d 267, 273 (2d Cir. 2011) (applying the adverse action test but "[r]ecognizing that [the] test is

highly context-specific")).

As a threshold matter, the Court agrees with Defendants that enforcement of the MWAP

policy does not constitute an adverse employment action, given that there are no allegations that

the policy was selectively enforced against Plaintiff. (*See* Dkt. No. 22-1, at 14–15 (first citing

*Morgan v. Colvin*, No. 15-cv-00107, 2016 WL 7168015, at \*26, 2016 U.S. Dist. LEXIS 169643,

at \*64 (D. Me. Dec. 7, 2016) ("[Plaintiff] concedes that merely enforcing rules does not amount

to an adverse employment action."), *report and recommendation adopted* 2017 WL 318629,

2017 U.S. Dist. LEXIS 8634 (D. Me. Jan. 23, 2017), *aff'd sub nom. Morgan v. Berryhill*, No. 17-

1187 (1st Cir. 2017), and then citing *Sales v. Smith*, No. 11-cv-00239, 2012 WL 5389675, at \*6,

2012 U.S. Dist. LEXIS 157454, at *15–16 (S.D. Ohio Nov. 2, 2012) (finding that the plaintiff

had not shown adverse action when he alleged that the defendant "simply enforced prison rules

against him" and "fail[ed] to provide any evidence to support his allegations of selective

enforcement"), *report and recommendation adopted* 2013 WL 1327069, 2013 U.S. Dist. LEXIS

44698 (S.D. Ohio Mar. 28, 2013)). Plaintiff does not allege that the MWAP policy was

selectively enforced; in fact, he alleges that RMDs "repeatedly and systematically refused the

prescription or re-prescription of MWAPs to patients in desperate need . . . no matter the

recommendations of treating providers and specialists," (Dkt. No. 1, ¶ 86), and that other

medical providers at Mohawk and Walsh RMU also challenged the application of the MWAP

policy to their patients, (*id.* ¶¶ 103–105). Although Plaintiff alleges that he was "singled out" and

"treated differently than the other medical providers," (*id.* ¶ 106), Plaintiff does not allege any

facts suggesting there was differential treatment with respect to the enforcement of the MWAP

policy. Thus, the Court finds that Plaintiff's allegations regarding Defendants' denial of his

MWAP medication requests in accord with the MWAP policy, (*e.g.*, Dkt. No. 1, ¶¶ 115, 118,

121, 131, 138), do not plausibly allege an adverse employment action.[10]

Plaintiff alleges that he faced the following conditions at Walsh RMU, aside from

enforcement of the MWAP policy: (1) Henderson locked him out of the facility, demanded he go

into her office, and "berated him for prescribing a[n] MWAP medication and then filing a

complaint about her," (*id.* ¶ 122); (2) in mid-2019, Henderson and Parkmond "ordered nurses to

withhold assistance from [Plaintiff] for several patients," (*id.* ¶ 123); (3) Henderson prohibited

---

[10] The Court also notes that the MWAP policy was a DOCCS-wide policy that pre-dated Plaintiff's protected speech, and, as such, Plaintiff has not plausibly alleged a causal connection between his protected speech and the consistent enforcement of the policy. *See Morales v. City of New York*, No. 21-cv-925, 2022 WL 2840035, at *2, 2022 U.S. App. LEXIS 20112, at *3 (2d Cir. 2022) (summary order) (noting that for a First Amendment retaliation claim, a plaintiff must ultimately "establish that protected speech was a but-for cause of some adverse employment action").

nurses from assisting Plaintiff in the treatment of a hemophiliac patient after Plaintiff ordered

that the patient be permitted to self-administer his medication, (*id.* ¶¶ 124–27); (4) after

Plaintiff's request for medication for a quadriplegic patient was denied, Henderson and Dinello

prohibited him from treating this patient and Henderson ordered correctional officers to prohibit

him from entering the patient's room, (*id.* ¶¶ 129–33); (5) Henderson disregarded Plaintiff's

treatment order for a patient with multiple sclerosis who needed catheters in favor of a treatment

order which was "[in]consistent with standard medical care," (*id.* ¶¶ 134–37); and (6) on "many

occasions," Plaintiff's "treatment plans and those of other doctors that served with him were

materially interfered with or denied by the Defendants," (*id.* ¶ 140). Plaintiff also alleges that

Defendants frustrated his attempts at obtaining a transfer to a position at Cayuga. (*Id.* ¶¶ 143–

57).

Defendants assert that (1) Plaintiff's allegations about interference with treatment of his

patients at Walsh RMU does not plausibly allege constructive discharge, because Plaintiff does

not allege that he was "forced to resign," and a "voluntary leave of absence where the plaintiff

remains employed and returns to work a mere two months later does not constitute constructive

discharge," (Dkt. No. 22-1, at 16– 17 (arguing that Plaintiff's allegations that he declined an

opportunity to work at Five Points, took a leave of absence instead, and then "voluntarily

decided to return to Southport" "fall well short of the requirements to plead adverse action by

way of constructive discharge")),[11] and (2) once he was at Southport, Plaintiff's allegations that

Defendants frustrated his efforts to obtain a position at Cayuga "again fall well short of

---

[11] As to Plaintiff's decision not to accept the position at Five Points, although "[a]n employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge," *Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000), Plaintiff alleges that Five Points would have been a two-hour commute from his house, and Plaintiff did ultimately pursue alternatives to resignation including a temporary leave followed by a transfer to Southport.

satisfying the adverse action requirement," because failure to provide Plaintiff with a transfer of his choosing is, alone, insufficient to plead constructive discharge, (*id.* at 17–18).

"A constructive discharge occurs where an employer, rather than discharging an employee directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Ocasio v. Mohawk Valley Comm. Coll.*, 20-cv-1355, 2021 WL 4477241, at *10, 2021 U.S. Dist. LEXIS 187890, at *28 (N.D.N.Y. Sept. 30, 2021) (citing *Ryle v. Rehrig Pac. Co.*, 19-cv-1478, 2020 WL 6196144, at *10, 2020 U.S. Dist. LEXIS 195962, at *29 (N.D.N.Y. Oct. 22, 2020)) (internal quotations and alterations omitted). "[W]orking conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)).

The Court agrees with Defendants that a temporary leave of absence, standing alone, likely would not rise to the level of a constructive discharge. *See, e.g.*, *Brescia v. LTF Club Mgmt. Co., LLC*, No. 18-cv-08715, 2020 WL 137311, at *7, 2020 U.S. Dist. LEXIS 7163, at *20–21 (S.D.N.Y. Jan. 9, 2020) ("A suspension or leave of absence may be sufficient to establish a constructive termination, but the case law reveals that the suspension or leave generally must be of a 'permanent' nature.").

But in his opposition brief, Plaintiff responds that while he first took a leave of absence in September 2019, he then took a temporary assignment at Southport with an arduous commute while he waited for a position at Cayuga to open. (*See* Dkt. No. 24, at 18–19). Aside from asserting that Plaintiff's decision to return from his leave of absence to work at Southport "fall[s] short of the requirements to plead adverse action by way of constructive discharge," (Dkt. No.

22-1, at 17), Defendants do not address whether this unique set of facts—a short leave of absence, followed by a transfer to a position with an untenable commute, followed by retirement—plausibly states a claim of constructive discharge.

"[D]istrict courts in this Circuit and several United States courts of appeals have applied the constructive discharge doctrine to situations where an employee voluntarily transfers to a different position with the same employer." *United States v. N.Y.C. Dep't of Educ.*, Nos. 16-cv-4291, 16-cv-4844, 2017 WL 435940, at *7, 2017 U.S. Dist. LEXIS 13603, at *22–23 (S.D.N.Y. Jan. 31, 2017), *report and recommendation adopted*, 2017 WL 1319695, 2017 U.S. Dist. LEXIS 51379 (S.D.N.Y. Apr. 4, 2017); *see also Claes v. Boyce Thompson Inst. for Plant Research*, 88 F. Supp. 3d 121, 126–127 (N.D.N.Y. 2015) (applying the constructive discharge doctrine where an employee accepted a transfer of employment); *Ley v. Dep't of Corr. & Cmty. Supervision*, No. 17-cv-918, 2020 WL 4928208, at *9, 2020 U.S. Dist. LEXIS 44470, at *26–30 (W.D.N.Y. Mar. 11, 2020) (same), *report and recommendation adopted* 2020 WL 4926549, 2020 U.S. Dist. LEXIS 152270 (W.D.N.Y. Aug. 21, 2020). To show that a voluntary transfer constituted a constructive discharge, an employee must allege that "(1) [he] was [retaliated] against to the point that working conditions were so intolerable that a reasonable person in [his] shoes would feel compelled to transfer; and (2) [his] transfer created a materially significant disadvantage in the terms and conditions of [his] employment." *N.Y.C. Dep't of Educ.*, 2017 WL 435940, at *8, 2017 U.S. Dist. LEXIS 13603, at *24.

Here, Plaintiff has plausibly alleged that the conditions at Walsh RMU, viewed as a whole, would be intolerable for a doctor in his position. Although Defendants assert that the interference with treatment of patients had "no bearing upon the material terms and conditions of [Plaintiff's] employment," (Dkt. No. 22-1, at 16), Plaintiff alleges that, as a physician, he was

"[g]uided by his *Hippocratic Oath* 'to do good or to do no harm'" and had an "ethical

responsibility not to discriminate against patients on the basis of . . . incarceration status," and

that "[u]ltimately, the decision as to the proper medical treatment to inmates l[ay] with the prison

physicians." (Dkt. No. 1, ¶¶ 26, 27, 38). In tension with Plaintiff's ethical and professional

obligations, Defendants allegedly ordered assistance withheld from him, prevented him from

treating and accessing patients, imposed treatments which were inconsistent with standard

medical care, and berated him for complaining about "unnecessary suffering and inhumane

treatment." (*Id.* ¶¶ 122–140). While "routine disagreements with supervisors or mild criticisms . .

. are simply insufficient to establish the sort of 'intolerable' working conditions necessary to a

constructive discharge claim," *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010),

"working conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant

that a reasonable person *in the employee's shoes* would have felt compelled to resign,'" *Terry*,

336 F.3d at 152 (emphasis added). Here, Plaintiff has plausibly alleged that a reasonable

physician and Facility Director in his shoes would find these conditions intolerable.

Plaintiff has also plausibly alleged that his transfer to Southport created a materially

significant disadvantage in the terms and conditions of his employment. "A 'materially

significant disadvantage' in working conditions includes 'a decrease in wage or salary, a less

distinguished title, a material loss of benefits, or other indices . . . unique to the particular

situation.'" *N.Y.C. Dep't of Educ.*, 2017 WL 435940, at *8, 2017 U.S. Dist. LEXIS 13603, at *25

(citing *Williams v. R.H. Donnelly, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)). "It 'must be more

disruptive than a mere inconvenience or alteration of job responsibilities.'" *Id.* (citing *Williams*,

368 F.3d at 128). Here, Plaintiff alleges that Southport was a two-hour drive from his house (four

hours round-trip), and that during the winter, the drive was "treacherous and dangerous." (Dkt.

No. 1, ¶ 146). The Court finds these allegations sufficient to allege that the "treacherous"

commute to Southport rose above a "mere inconvenience," and constituted a significant

disadvantage in Plaintiff's working conditions. *See Quiroz v. Ganna Const.*, No. 97-cv-0480,

1999 WL 59836, at *21, 1999 U.S. Dist. LEXIS 1285, at *68–69 (N.D. Ill. Jan. 26, 1999)

(finding the plaintiff's allegations that after she complained the defendant assigned her to a work

project requiring a five-hour commute, a jury could "find that these facts demonstrate[d]

intolerable working conditions"); *Fuller v. Belleville Area Cmty. Coll. Dist. No. 522*, No. 18-cv-

01123, 2020 WL 1287743, at *5, 2020 U.S. Dist. LEXIS 46708, at *15–16 (S.D. Ill. Mar. 18,

2020) (finding that moving the plaintiff to a location requiring a four-hour roundtrip commute

was "a plausibly-pleaded adverse employment action").

Thus, at this stage, and absent briefing from the parties on whether Plaintiff's voluntary

transfer to Southport constituted a constructive discharge, the Court cannot say as a matter of law

that the transfer is not an adverse employment action and therefore declines to dismiss Plaintiff's

First Amendment claim for failure to allege an adverse employment action.[12]

### 3.    Causation

Defendants argue that Plaintiff has not alleged a causal connection between his speech

regarding the MWAP policy and any adverse employment action. (Dkt. No. 22-1, at 18–20).

Defendants assert that (1) there is no direct evidence of discriminatory animus, and (2) causation

cannot be inferred through disparate treatment or temporal proximity. (*Id.* at 19–20). Plaintiff

responds that Defendants' retaliation "was simultaneous and continuous" with his speech, and

notes that Henderson "berated him for his opposition of the MWAP policy" and "order[ed] him

to stop writing letters . . . about the MWAP [p]olicy." (Dkt. No. 24, at 20–21).

---

[12] The Court therefore does not address Plaintiff's allegations about the Cayuga position or his ultimate retirement.

To prevail on a First Amendment retaliation claim, a plaintiff must ultimately "establish that protected speech was a but-for cause of some adverse employment action." *Morales*, 2022 WL 2840035, at *2, 2022 U.S. App. LEXIS 20112, at *3 (citing *Morris*, 196 F.3d at 110). Causation can be established "either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Id.* (citing *Morris*, 196 F.3d at 110).

Plaintiff has plausibly alleged retaliatory animus through his allegations that Henderson "berated him for prescribing a[n] MWAP medication and then filing a complaint about her," (Dkt. No. 1, ¶ 122), and called him into her office numerous times to "tell him to stop writing letters to the DOCCS' Commissioner and Chief Medical Officer in Albany about the MWAP policy," (*id.* ¶ 139); *see, e.g.*, *Mandell v. County of Suffolk*, 316 F.3d 368, 383–84 (2d Cir. 2003) (finding direct evidence of retaliatory animus in failure to promote where superiors told the employee that he should learn to "keep his mouth shut" and that "baggage" from his testimony about antisemitism in the police department could adversely affect his career). These incidents occurred in June and July 2019, around the time Defendants Henderson, Dinello, and Parkmond allegedly interfered with Plaintiff's treatment of several patients in "mid-2019." (*Id.* ¶ 123). Although Plaintiff does not allege a specific incident of protected speech after November 1, 2017, (*see* ¶ 116; *see also supra* note 8), Plaintiff alleges that his opposition to the MWAP policy continued into mid-2019, (*see id.* ¶¶ 123, 139). Plaintiff therefore has plausibly alleged that his speech was causally connected to the adverse employment action he experienced.

4.   **Personal Involvement**

Defendants argue that Plaintiff has failed to plausibly allege the personal involvement of

Defendants Koeningsmann and Parkmond in the alleged adverse actions. (Dkt. No. 22-1, at 20--

23).[13]

"[T]he 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir.

2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see also Warren v. Pataki*,

823 F.3d 125, 136 (2d Cir. 2016); *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir.

2015). A plaintiff must "allege a tangible connection between the acts of a defendant and the

injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). The Second Circuit

recently clarified that "there is no special rule for supervisory liability" and explained that "a

plaintiff must plead and prove 'that each Government-official defendant, through the official's

own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609,

618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

Defendants first assert that Plaintiff has failed to plausibly allege Koenigsmann's

personal involvement because, while Plaintiff alleges that Koenigsmann was aware of his

"complaints concerning the MWAP policy," he has not alleged that Koenigsmann was involved

in "any alleged retaliatory acts that followed." (Dkt. No. 22-1, at 21–22). Plaintiff responds that

Koenigsmann was personally involved in the adverse actions against him because: (1)

Koenigsmann "initiated and orchestrated many of the events that flowed from his decision to

---

[13] Defendants also assert that "[t]o the extent Plaintiff premises his retaliation claim upon Defendant Morley's and Dinello's actions that frustrated his efforts to obtain employment at Cayuga resulting in his constructive discharge, Plaintiff has failed to plead Defendant Henderson's personal involvement in this adverse action." (Dkt. No. 22-1, at 22–23). But as discussed above, the Court declines to dismiss Plaintiff's First Amendment retaliation claim in light of his allegations regarding his transfer to Southport. The Court therefore declines to dismiss the First Amendment retaliation claim against Defendant Henderson for lack of personal involvement.

promulgate and strictly enforce the MWAP [p]olicy," and (2) Koenigsmann was "grossly

negligent in supervising subordinates" who retaliated against Plaintiff. (Dkt. No. 24, at 21–22).

However, because enactment and enforcement of the MWAP policy did not constitute an adverse

employment action, Plaintiff has not plausibly alleged that Koenigsmann's "decision to

promulgate and strictly enforce" the policy violated his constitutional rights. *See Jackson v.*

*Annucci*, No. 20-cv-02008, 2021 WL 2581340, at *5, 2021 U.S. Dist. LEXIS 117276, at *14

(S.D.N.Y. June 23, 2021) (finding no personal involvement where the allegations did not

"connect Annucci to the specific constitutional violations" alleged). And, following *Tangreti* it is

not enough to allege that a supervisor was grossly negligent in the supervision of his

subordinates. 983 F.3d at 620.

  Second, Defendants assert that Plaintiff failed to allege Parkmond's personal involvement

because the sole allegation in the Complaint relating to Defendant Parkmond's actions is: "In

mid-2019, as a result of [Plaintiff's] continued opposition to the MWAP policy . . . Defendant

Parkmond ordered nurses to withhold assistance from Dr. Salvana for several patients." (Dkt.

No. 22-1, at 22 (citing Dkt. No. 1, ¶ 123)). Defendants note that this allegation is "vague" and

provides "absolutely no details concerning the nature of these orders or when they occurred."

(*Id.*). Plaintiff responds that Parkmond served in a supervisory role as Nurse Director; was aware

of Plaintiff's opposition to the MWAP policy; and "directly engaged in retaliation" against

Plaintiff. (Dkt. No. 24, at 21–22). But Parkmond's supervisory role is not sufficient to allege that

she herself violated Plaintiff's First Amendment rights, and Plaintiff does not allege how

Parkmond became "aware" of his opposition to the MWAP policy, nor does he detail her

involvement in ordering nurses to withhold assistance from Plaintiff.

For the reasons above, Defendants' motion to dismiss the First Amendment retaliation claims against Defendants Koenigsmann and Parkmond for failure to plausibly allege their personal involvement is granted, and the motion to dismiss Plaintiff's First Amendment retaliation claim is otherwise denied.

### D.     Equal Protection

Defendants argue that Plaintiff's Equal Protection claim must be dismissed because: (1) it is duplicative of his First Amendment retaliation claim; (2) his "own allegations reveal that he was not treated differently due to belonging to the group of physicians who opposed the MWAP policy"; and (3) he has failed to plead adverse action, causal connection, and the personal involvement of the Defendants. (Dkt. No. 22-1, at 23–24). Plaintiff responds that he is not asserting a class-based Equal Protection claim, but rather a *LeClair* claim for selective treatment, and that his claim is not duplicative.[14] (Dkt. No. 24, at 23, 25–26 (citing *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980))).

To state a claim for an Equal Protection violation based on selective enforcement under *LeClair*, a plaintiff must allege that: "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). Thus, under this test, a plaintiff must show both

---

[14] Insofar as Plaintiff also raises a claim under a "class-of-one" theory of Equal Protection, in which a plaintiff alleges that he was "intentionally treated differently from others similarly situated with no rational basis for the difference in treatment," (*see* Dkt. No. 1, ¶¶ 161–62 (alleging that Plaintiff was treated differently than those similarly situated with "no rational basis")); *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court has held that "a 'class-of-one' theory of equal protection has no place in the public employment context," *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594, 605–08 (2008).

"disparate treatment and impermissible motivation." *Id.* (quoting *Bizzarro v. Miranda*, 394 F.3d

82, 87 (2d Cir. 2005)).

Defendants argue that Plaintiff's Equal Protection and First Amendment claims are

"premise[d] . . . upon the same protected conduct and purported adverse actions," and therefore,

the Court should analyze his claim under the First Amendment as the "most explicit source of

constitutional protection." (Dkt. No. 22-1, at 23–24 (citing *Graham v. Connor*, 490 U.S. 386,

395 (1989))). Plaintiff responds that his First Amendment claim is "driven by his protected right

to speak out about wrongdoing and in doing so also petition government authorities to redress his

concerns," while his "Equal Protection retaliation claim is focused on Defendants' conscious

decision to retaliate by treating him differently from other health care providers who also

opposed the MWAP policy." (Dkt. No. 24, at 25–26).

"Courts in the Second Circuit have dismissed equal-protection claims that merely restate

First Amendment retaliation claims." *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 484

(E.D.N.Y. 2019) (declining to dismiss the plaintiff's First Amendment retaliation claims, but

dismissing an Equal Protection claim "based on . . . protected First Amendment activity" as

duplicative, noting that "courts should not unnecessarily stretch sections of the Constitution to

reach wrongs already covered by other sections"); *see also Frisenda v. Inc. Vill. of Malverne*,

775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) (dismissing Equal Protection claim based on

retaliation for First Amendment activity as duplicative and collecting cases); *Washington v. Afify*,

968 F. Supp. 2d 532, 541 (W.D.N.Y. 2013) (same).

Here, Plaintiff's claim is premised on the assertion that Plaintiff "was harassed,

threatened, and otherwise treated with hostility *because he challenged the inhumane and*

*negligent treatment of patients*," and that there was "no rational basis for the treatment Plaintiff

received . . . other than to discriminate and retaliate against him *for standing up for his patients*,"

(Dkt. No. 1, ¶¶ 159, 162 (emphases added)). The cases Plaintiff cites for the proposition that

"claims are duplicative when they arise out of the same facts and do not allege distinct damages"

did not involve First Amendment and Equal Protection claims. (*See* Dkt. No. 24, at 25 (first

citing *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175–76 (2d Cir. 2008)

(finding that contract claims were not duplicative of claims for account stated because the

plaintiff could not recover attorney's fees on claims for account stated), and then citing *Estate of*

*D.B. v. Thousand Island Cent. Sch. Dist.*, 169 F. Supp. 3d 320, 338 (N.D.N.Y. 2016) (finding

that claims of negligent infliction of emotional distress and negligent supervision were "not so

similar as to warrant" dismissal as duplicative), *abrogated on other grounds by Christiansen v.*

*Omnicom Grp., Inc.*, 852 F.3d 195 (2d Cir. 2017))). And, insofar as Plaintiff argues that a party

may "properly allege alternative or even inconsistent claims or legal theories," (Dkt. No. 24, at

25 n.8 (first citing Fed. R. Civ. P. 8(a)(3) and 8(d)(2)–(3), and then citing *Manhattan Fuel Co. v.*

*New England Petroleum Corp.*, 422 F. Supp. 797, 802 (S.D.N.Y. 1976))), the question here is

whether Plaintiff may raise duplicative claims, not alternative or inconsistent ones.

Therefore, the Court dismisses Plaintiff's Equal Protection claim as duplicative of his

First Amendment claim.

### E.     State Law Claims

Defendant moves to dismiss Plaintiff's state law claims under N.Y. Lab. Law § 741 and

N.Y. Civ. Serv. Law § 75-b, arguing, inter alia, that they are barred by N.Y. Correct. Law § 24

and, in any event, fail to state a claim. (Dkt. No. 22-1, at 25–29). Plaintiff, however, responds

that he has raised these claims only against DOCCS, not the individual Defendants; Plaintiff

accurately notes that N.Y. Correct. Law § 24 applies to claims "against any officer or employee

of the department . . . in his or her personal capacity," (Dkt. No. 22-1, at 25–26).

N.Y. Lab. Law § 741 and N.Y. Civ. Serv. Law § 75-b prohibit certain retaliatory conduct

by certain public "employers," including the State of New York.[15] These claims, like Plaintiff's

§ 1983 claims against DOCCS, are barred by the doctrine of sovereign immunity.[16] "DOCCS, as

an arm of the state, stands in the same position as the State of New York." *White*, 2019 WL

2578270, at *1, 2019 U.S. Dist. LEXIS 105272, at *2. While federal courts may exercise

supplemental jurisdiction over state law claims "that are so related to claims in the action within

such original jurisdiction that they form part of the same case or controversy under Article III of

the United States Constitution," 28 U.S.C. § 1367(a), that grant of supplemental jurisdiction

"does not extend to claims against nonconsenting state defendants." *Raygor v. Regents of the

Univ. of Minn.*, 534 U.S. 533, 541–42 (2002); *see also Doe v. State Univ. of New York Purchase

Coll.*, No. 21-cv-8417, 2022 WL 2972200, at *10, 2022 U.S. Dist. LEXIS 133690, at *32

(S.D.N.Y. July 27, 2022) ("The Supreme Court has also instructed that th[e] principle of

Eleventh Amendment immunity 'applies as well to state-law claims brought into federal court

under pendent jurisdiction.'" (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,

121 (1984))).

---

[15] *See* N.Y. Lab. Law § 741(1)(b), (2) (forbidding any "employer" from taking "retaliatory action against any employee," for objecting to a policy that the employee "reasonably believes constitutes improper quality of patient care" and defining "employer" to include "the state, or any political subdivision of the state which . . . operates and provides health care services under the mental hygiene law or the correction law"); N.Y. Civ. Serv. Law § 75-b(1)(a), (2)(a) (forbidding any "public employer" from "dismiss[ing] or tak[ing] other disciplinary or other adverse personnel action against a public employee," "because the employee discloses to a governmental body" certain specified information, and defining "public employer" to include the State of New York or as "any other public corporation, agency, instrumentality or unit of government which exercises governmental power under the laws of the state").

[16] Although Defendants assert that sovereign immunity "bars Plaintiff's claims against DOCCS in their entirety," (Dkt. No. 22-1, at 9), they do not specifically move for dismissal of Plaintiff's state law claims against DOCCS under this doctrine, (*see id.* (asserting that the complaint "must be dismissed to the extent it asserts section 1983 claims against DOCCS")). In any event, the Court may address the issue *sua sponte*. *See Atl. Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) ("Although the parties do not address the Eleventh Amendment in their briefs, we raise it *sua sponte* because it affects our subject matter jurisdiction.").

New York State has not waived its immunity from suit in federal court by virtue of creating a state law cause of action under N.Y. Lab. Law § 741 and N.Y. Civ. Serv. Law § 75-b. *See Vaden v. Connecticut*, 557 F. Supp. 2d 279, 289 (D. Conn. 2008) ("[S]tate statutory provisions consenting to suit in state court . . . are not waivers of Eleventh Amendment immunity from suit in federal court" (citing *Smith v. Reeves*, 178 U.S. 436, 441 (1900) ("A state does not consent to suit in federal court by consenting to suit in the courts of its own creation."))); *Fry v. McCall*, 945 F. Supp. 655, 661 (S.D.N.Y. 1996) ("[N.Y. Civ. Serv. Law] section 75-b does not provide for jurisdiction in federal court or act as a waiver of Eleventh Amendment immunity."); *Gonzalez v. N.Y.S. Div. of Human Rights*, No. 10-cv-98, 2011 WL 4582428, at \*3, 2011 U.S. Dist. LEXIS 114662, at \*8 (S.D.N.Y. Sept. 29, 2011) ("It is well settled that New York has not waived its immunity from suit in federal court for violations of state law" including N.Y. Civ. Serv. Law § 75-b) .

Therefore, Plaintiff's N.Y. Lab. Law § 741 and N.Y. Civ. Serv. Law § 75-b claims against DOCCS are barred by the Eleventh Amendment and must be dismissed.

## IV.   LEAVE TO AMEND

Plaintiff has requested leave to amend the complaint. (Dkt. No. 24, at 32). To the extent that Plaintiff believes that he could allege facts to remedy the defects the Court has identified, the Court will permit Plaintiff to file a letter motion seeking permission to amend. Any such motion must be filed with a proposed amended complaint, and comply with N.D.N.Y. Local Rule 15.1(a), and must be filed by August 23, 2022. Defendant may respond in a letter brief by August 30, 2022.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 22) is **GRANTED** as to Plaintiff's Equal Protection, N.Y. Lab. Law § 741, and N.Y. Civ. Serv. Law § 75-b claims (the First, Third and Fourth Causes of Action); and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 22) is **GRANTED** as to Plaintiff's claims against Defendants DOCCS, Koenigsmann, and Parkmond; and it is further

**ORDERED** that Defendant's motion is otherwise **DENIED**; and it is further

**ORDERED** that if Plaintiff does not file a letter motion seeking leave to amend by August 23, 2022, Defendants DOCCS, Koenigsmann, and Parkmond will be terminated and Plaintiff's First Amendment retaliation claim under 42 U.S.C. § 1983 against Defendants Henderson, Dinello, and Morley will proceed.

**IT IS SO ORDERED.**

Dated: <u>August 10, 2022</u>
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

40

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MICHAEL F. SALVANA, M.D.,

<div style="margin-left:3em">Plaintiff,</div>

v.

JOHN MORLEY, M.D., DAVID S. DINELLO, M.D.,
PATRICIA HENDERSON, R.N., and BETTY M.
PARKMOND, R.N.,

<div style="margin-left:3em">Defendants.</div>

5:21-cv-00735 (BKS/ML)

---

**Appearances:**

*For Plaintiff:*
Carlo Alexandre C. de Oliveira
Cooper Erving & Savage LLP
20 Corporate Woods Boulevard, Suite 501
Albany, NY 12211

Richard Condit
Andrea Forsee
Mehri & Skalet, PLLC
2000 K Street, NW, Suite 325
Washington, DC 20006

*For Defendants:*
Letitia James
New York State Attorney General
Jorge A. Rodriguez
Assistant Attorney General, Of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

Plaintiff Michael F. Salvana, M.D., a former Clinical Physician and Facility Health

Services Director with the New York State Department of Corrections and Community

Supervision ("DOCCS"), brings this action against DOCCS Deputy Commissioner and Chief

Medical Officer John Morley, M.D.; Regional Medical Director for Elmira and Oneida "HUBS"

David S. Dinello, M.D.; DOCCS Deputy Superintendent for Health Services Patricia Henderson,

R.N.; and DOCCS Nurse Director Betty M. Parkmond, R.N. (Dkt. No. 38, ¶¶ 6, 13-16, 19, 28).[1]

Plaintiff raises a First Amendment retaliation claim under 42 U.S.C. § 1983. (*Id.* ¶¶ 171–83).

Presently before the Court are Defendants' motion for summary judgment (Dkt. No. 92)

and Plaintiff's motion for summary judgment (Dkt. No. 93), both filed pursuant to Rule 56 of the

Federal Rules of Civil Procedure. Each motion is fully briefed, (Dkt. Nos. 92-9, 93-34, 98-3, 99,

101, 102, 105, 106). The Court heard oral argument on the motions on March 4, 2025. For the

reasons that follow, Defendants' motion is granted and Plaintiff's motion is denied.

### II.    FACTS[2]

#### A.    Plaintiff's and Defendants' Roles at DOCCS

DOCCS is "an executive agency of the State of New York charged with, *inter alia*, the

oversight and administration of the state prison system and community supervision within the

---

[1] By Order entered on August 10, 2022, this Court granted in part a motion to dismiss the following claims asserted in the Complaint: Plaintiff's Equal Protection, N.Y. Lab. Law § 741, and N.Y. Civ. Serv. Law § 75-b claims, and Plaintiff's claims against Defendants DOCCS, former DOCCS Deputy Commissioner and Chief Medical Officer Carl Koenigsmann and DOCCS Nurse Director Betty M. Parkmond, R.N. (Dkt. No. 26). Plaintiff sought leave to file an amended complaint, which the Court granted in part, with respect to the new allegations as to Defendant Parkmond. (Dkt. No. 37).

[2] The facts, which are undisputed unless otherwise noted, are drawn from Defendants' Rule 56.1 Statement of Material Facts, (Dkt. No. 92-8), and Response to Plaintiff's Statement of Material Facts, (Dkt. No. 98-2), as well as Plaintiff's Rule 56.1 Amended Statement of Material Facts, (Dkt. No. 94), and Response to Defendants' Statement of Material

State." (Dkt. No. 92-8, ¶ 2). Salvana, a licensed medical doctor, became the Medical Director at Walsh Regional Medical Unit (RMU) in 2014. (Dkt. No. 98-2, ¶¶ 2, 10).[3] Walsh RMU is a maximum-security medical facility within the Mohawk Correctional Facility, "which provides medical services and treatment to incarcerated individuals with serious and chronic medical conditions requiring intensive treatment." (*Id.* ¶ 11). Each patient at Walsh RMU is assigned a medical team comprised of a clinician, nurses, and other appropriate staff, who meet weekly to discuss patient care and make decisions regarding patient treatment, "including medication decisions." (*Id.* ¶¶ 12–14). Plaintiff testified that in addition to his other duties as the Medical Director, he managed the care of the twenty or thirty sickest patients. (Dkt. No. 93-2, at 73).

As a Regional Medical Director (RMD) with DOCCS, Defendant David S. Dinello, M.D. *inter alia* managed physicians at DOCCS facilities, reviewed specialty requests, reviewed and created medical policies, took emergency provider telephone calls, and directly supervised Plaintiff with respect to medical issues arising from his position. (Dkt. No. 92-8, ¶¶ 13–17). When Plaintiff's tenure at Walsh RMU began, Defendant Patricia N. Henderson, R.N. was the Director of Nursing in the Walsh RMU, but she was promoted to acting Deputy Superintendent of Health (DSH) at Mohawk in August 2017 and to Mohawk DSH in January 2018. (*Id.* ¶¶ 20, 22–23). As DSH, Henderson was charged with, *inter alia*, administering and supervising the medical facilities and ensuring compliance with DOCCS policies. (*Id.* ¶¶ 26–27). Defendant Betty M. Parkmond, R.N. was a Registered Nurse Supervisor 1 at Walsh RMU until July 2019

---

Facts, (Dkt. No. 99-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[3] Plaintiff previously worked for DOCCS as a part-time physician at Mid-State Correctional Facility from 2003 to 2005, and at Walsh Regional Medical Unit from 2005 to 2011. (Dkt. No. 98-2, ¶¶ 7–9). He left DOCCS in 2011 and returned to Walsh RMU in 2014. (*Id.* ¶¶ 9–10).

when she was promoted to Director of Nursing at Walsh RMU. (*Id.* ¶¶ 29–30). In her latter role, she was charged with administration and management of nursing staff at Walsh RMU. (*Id.* ¶ 31).

## B.    The Medications With Abuse Potential Policy

Health Care Services Policy 1.24, otherwise known as the Medications With Abuse Potential ("MWAP") Policy was a medical services policy in effect at DOCCS from June 1, 2017, until February 8, 2021. (*Id.* ¶ 34). The goal of the policy was to address problems with addiction within DOCCS by assuring that addictive medications were only prescribed to incarcerated individuals when medically necessary. (*Id.* ¶ 36). In practice, the policy required that prescribers document the need for the use of medications with abuse potential and seek the approval of an RMD when prescribing medications with abuse potential, including opiates, benzodiazepines, all controlled substances listed in schedules two through four of the Controlled Substances Act, and certain noncontrolled substances such as pregabalin and gabapentin. (*Id.* ¶¶ 40, 42, 44). Defendant Dinello was "involved in the development and implementation of the MWAP policy," (Dkt. No. 98-2, ¶ 35), and according to Plaintiff, he was the "principal author." (*Id.*). On September 10, 2018, a revised MWAP Policy was issued that still required providers to document the need for use of medications with abuse potentials and seek approval for their use. (Dkt. No. 92-8, ¶¶ 59, 61).

## C.    Salvana's Opposition to the Policy

Salvana was opposed to the MWAP Policy, and complained to administrators at Walsh RMU, Mohawk, and DOCCS' central office. (*Id.* ¶¶ 68–70). On July 7, 2017, Plaintiff emailed a complaint from his DOCCS email account directly to then DOCCS Chief Medical Officer Koenigsmann,[4] Mohawk Superintendent Gonyea, then Deputy Superintendent Tousignant, and

---

[4] Dr. Carl Koenigsmann preceded Defendant Dr. John N. Morley as Chief Medical Officer of DOCCS. (Dkt. No. 98-2, ¶ 26). The CMO manages DOCCS' operations relating to the provision of medical services and develops, approves,

Defendant Henderson. (Dkt. No. 93-19, at 2). In that email, Plaintiff detailed Defendant

Dinello's denial of MWAP medications for a specific patient and explained why that patient

needed the medications. (*Id.*). Plaintiff then wrote:

> I have refused to stop these two medications as they are essential
> for this patient. I also don't need help in managing these
> medications given the extensive training I had on the pain service
> at Yale University Medical Center. This is not the only patient I
> manage that Dr Dinello has refused to approve needed medication
> on. These patients are now asking for there [sic] problem lists
> knowing there are attempts to stop essential medication. They are
> likely going to bring litigation and perhaps reports of denial of
> needed medication to the Board of Medical Examiners. If a
> medication is denied, I will continue to order it if there are no
> alternatives, as I know what is best for my patients whom I am in
> contact with on a daily basis. Your attention to this matter is
> needed ASAP.

(*Id.*). That same day, Koenigsmann replied to Plaintiff, copying only Gonyea, "You will be

hearing from Dr. Dinello to discuss a reasonable pain management program for this [patient], I

concur with your concerns." (*Id.*). On July 10, 2017, Plaintiff replied to Koenigsmann, copying

Gonyea, Tousignant, and Henderson, and stating:

> My concerns are not only for this patient but the many other
> inmates at Walsh who have very complicated histories and are
> among the most difficult to manage patients in DOCCS. . . .
> Several [Walsh inmates] are hinting at litigation involving
> consulting specialists recommending medications that are being
> denied. . . . I again am asking that the Walsh RMU be exempt from
> this prior approval policy given the nature of and number of
> patients we take care of.

(*Id.*). That same day, Koenigsmann replied to Plaintiff, copying only Dinello, "We will not be

exempting the RMU from the MWAP policy." (*Id.*).

---

and promulgates directives, policies, and procedures relating to medical care of incarcerated individuals at DOCCS
facilities. (Dkt. No. 92-8, ¶¶ 7, 10; Dkt. No. 99-1, ¶¶ 7, 10).

Later that month, on a bi-weekly call with the Office of the Commissioner of DOCCS, Superintendent Gonyea raised concerns about the MWAP Policy, and Associate Commissioner Charles F. Kelly asked him to provide some examples. (Dkt. No. 93-4, at 47). Plaintiff wrote a memorandum outlining eight examples of inmates with medical issues whose medications were denied. (*Id.* at 48–49). Plaintiff stated that "[t]he MWAP approval process is demeaning to the staff, interferes with good patient care and causes patients to undergo needless tests and consultations. The end point is poor patient care and potential litigation by inmates." (*Id.*). Gonyea sent the memorandum to Associate Commissioner Kelly in an email, stating, "I am sorry to have to bring this to the Commissioner's attention but I don't feel we have gotten anywhere when we addressed these concerns with Health Services." (*Id.* at 47). Associate Commissioner Kelly asked Assistant Commissioner Joan Smith, who reported to the CMO and assisted in overseeing healthcare at DOCCS facilities, to review the memorandum with Koenigsmann and provide comments before he would submit the memorandum to the Commissioner. (*Id.*; Dkt. No. 94, ¶ 27). Koenigsmann then emailed Dinello and asked him to comment on each of the examples so Koenigsmann could respond to the inquiry. (Dkt. No. 93-4, at 47.). Dinello subsequently emailed Plaintiff and asked him to provide specific DIN numbers[5] for each of the examples so that Dinello could "look into it." (*Id.*). Neither party has proffered an email reply from Plaintiff providing that information. Plaintiff contends that he never received a response from the Commissioner's office, nor from Koenigsmann or Dinello, and that he is unaware whether the Commissioner's office investigated the matter further. (*Id.* ¶ 23).

---

[5] A DIN number is an internal number used to identify an individual while in the custody of the Department of Corrections and Community Supervision. About the Parolee Lookup Glossary, N.Y. Dep't of Corr. & Cmty. Supervision, https://publicapps.doccs.ny.gov/ParoleeLookup/About?form=glossary (last visited Feb. 27, 2025).

On August 11, 2017, Dinello emailed Salvana, copying Gonyea, Henderson, and another

DOCCS employee stating:

> I have been informed by multiple sources that you are refusing to
> follow [the MWAP Policy]. I have been instructed by Dr.
> Koenigsmann to issue a Direct Order that you follow approved
> DOCCS Policy. Your compliance is expected. Actions that are out
> of compliance to the Direct Order of following [the MWAP Policy]
> will be met with the necessary actions. You can contact me at any
> time if you have questions and concerns regarding the Policy. I am
> always open to feedback and invite healthy collegial dialogue. Let
> me know if you have any questions.

(Dkt. No. 93-20, at 2).

On August 14, 2017, Dinello emailed Henderson, copying Plaintiff and another DOCCS

employee, and stating that he "received the summary of concerns" that were raised regarding the

MWAP Policy at a meeting on August 9, 2017 between Deputy Superintendents of Health and

Directors of Nursing. (Dkt. No. 93-4, at 51–52; Dkt. No. 92-8, ¶¶ 20, 30). Dinello added, "Let

me know when you are all available to meet and discuss the issues." (Dkt. No. 93-4, at 51–52).

Neither party has proffered an email reply.

On September 6, 2017, Plaintiff emailed Gonyea and Henderson about two patients

whose medication had been stopped, and further stated that an attorney had reached out to

another doctor "inquiring why medication recommended by a consultant was not being given."

(Dkt. No. 92-4, at 21–22). Plaintiff concluded, "I believe Dr. Dinello is trying to create statistics

that he can somehow use in his favor, all at the expense of practicing good medicine. This policy

created by Dr. Dinello has to stop before it creates bigger problems." (*Id.* at 22). That same day,

Gonyea forwarded Plaintiff's email to DOCCS Acting Commissioner Anthony Annucci,

Koenigsmann, and Associate Commissioner Kelly as an example of Gonyea's concerns about

"providing appropriate care and avoiding unnecessary legal issues." (*Id.* at 21). Gonyea asked

Dr. Koenigsmann to visit Walsh to meet with the doctors and see the operation of the RMU. (*Id.*). Later that day, Koenigsmann replied just to Gonyea and copied Dinello, stating "I am aware of the issues and concerns raised by your provider staff. I am also aware that Dr. Salvana has refused to speak to Dr. Dinello regarding his cases and MWAP process. I think that is the area that needs to be addressed first and foremost." (*Id.*). Dinello responded that day to Koenigsmann and Gonyea, stating that Dinello "personally went to Mohawk CF." (*Id.* at 20). Dinello stated that the first patient in Plaintiff's email is "stable" and that the second patient "should be able to return to Mohawk CF without a problem." (*Id.*). Dinello noted that he asked for the letter from the lawyer, and emphasized that he had "no ulterior motive regarding MWAP"; "that the MWAP Policy was not created to disrespect [Plaintiff] or any other provider"; and that he was "always available for discussion" and "more than happy to see the patients in person when necessary." (*Id.*).

On October 26, 2017, Plaintiff sent a letter via email from his DOCCS email account to Koenigsmann, Gonyea, Henderson, Tousignant, and two other people within DOCCS. (Dkt. No. 93-4, at 54). The letter, addressed to Koenigsmann, detailed medical issues concerning seven patient cases who had medicine denied. (*Id.* at 55-56). Salvana stated:

> I am contacting you before your planned visit on November 1, to
> let you know that the MWAP Policy at Mohawk and Walsh RMU
> continues to create significant problems in the management of our
> patients and in administering proper community standards of care.
> . . . It has been and continues to be very demeaning to continually
> have to request MWAP drugs only to have Dr. Dinello deny them.
> . . . There are many other examples and the denial of medication to
> treat pain in these patients violates the community standard of care.
> If you disagree with this then perhaps we can consult an outside
> agency, who could reassure us that we are giving proper care.

(*Id.*). Later that day, Henderson sent Plaintiff an email, copying Gonyea, informing Plaintiff that his correspondence was "totally inappropriate" and "[q]uite frankly, embarrassing" and that

Plaintiff should have sent the letter to Mohawk Superintendent Gonyea first for approval. (Dkt.

No. 92-2, at 9). In her declaration, Henderson explains that Plaintiff's letter "was not against

policy" but that it "undermin[ed] Gonyea's efforts to address Plaintiff's concerns about the

MWAP policy" "given [the] tone." (Dkt. No. 92-1, ¶ 37). Henderson further explains that she

sent the email to Plaintiff at Gonyea's direction, and that Gonyea was upset because he had

previously instructed Plaintiff to obtain his review and approval on any correspondence to

Koenigsmann. (*Id.* ¶¶ 38–39).[6]

On October 27, Koenigsmann responded, copying *inter alia* Dinello, Gonyea, and

Associate Commissioner Kelly, thanking Plaintiff for the update and stating,

> [W]e are coming to the facility to . . . have an opportunity to speak
> to you and the providers regarding the MWAP program and your
> concerns on Wed 11/1. Dr. Dinello will be attending. I look
> forward to hearing your concerns and opening a dialog with Dr.
> Dinello. The meeting on Wed is not appropriate for specific patient
> issues[,] rather a more general discussion regarding the MWAP
> policy.

(Dkt. No. 92-4, at 24). Later that day, Gonyea emailed Koenigsmann directly apologizing that

Plaintiff sent the letter; Gonyea said that Plaintiff "was told by Acting DSH Henderson not to

send you any further e mails on this subject unless I approved them. We will be dealing with him

on that matter." (*Id.*).

---

[6] Plaintiff has asserted that Henderson's statements are inadmissible hearsay not supported by the record. (Dkt. No. 99-1, ¶¶ 80–81). The Court notes that Plaintiff's first email, on July 7, 2017, was to Koenigsmann and nothing in the record suggests that Plaintiff was criticized or warned against emailing Koenigsmann at that time. However, according to Henderson, Gonyea asked Henderson to direct Plaintiff to obtain approval before submitting any additional complaints on or about October of 2017 because Gonyea was attempting to address issued raised by Plaintiff with DOCCS administrators in Albany. (Dkt. No. 92-1, ¶¶ 34–35). Gonyea himself told Koenigsmann in an email on October 27, 2017 that Henderson had instructed Plaintiff not to send further emails to Koenigsmann unless Gonyea approved them. (Dkt. No. 92-4, at 24). Because it appears that Henderson's statements could "be presented in a form that would be admissible in evidence," the Court can consider them on summary judgment. Fed R. Civ. P. 56(c)(2); *see also Figueroa v. Mazza*, 825 F.3d 89, 98 n.8 (2d Cir. 2016) ("[A]ny evidence considered on summary judgment must be reducible to admissible form.").

On November 1, 2017, Plaintiff participated in the November 2017 site visit with Koenigsmann and Dinello to discuss Plaintiff's concerns with the MWAP Policy. (Dkt. No. 98-2, ¶ 54). Plaintiff states that despite Koenigsmann's contention that the meeting was not an appropriate forum to discuss specific patients, Plaintiff did discuss the patients identified in the letter in the meeting as well. (Dkt. No. 93-4, ¶ 25). No immediate changes were made to the MWAP Policy after the meeting. (Dkt. No. 98-2, ¶ 56).

On December 26, 2017, Dinello emailed Walsh RMU providers, including Plaintiff, explaining that he recently visited the Walsh RMU and found that the MWAP Policy was not being followed. (Dkt. No. 92-4, at 29). Dinello reminded the providers of the need to comply with the terms of the MWAP Policy and labelled his email an "informal warning." (*Id.*). On or about January 18, 2018, Dinello, Koenigsmann, and Salvana participated in a conference regarding Salvana's MWAP Policy concerns. (Dkt. No. 92-8, ¶ 98). As a result of the conference, Salvana and Dinello reached a compromise about implementation of the MWAP Policy at Walsh RMU, which was memorialized in an email sent by Plaintiff, dated January 19, 2018. (*Id.* ¶¶ 99–100).

### D.    Enforcement of the Policy

After an incident in June 2019 where Salvana and Henderson disagreed about providing an MWAP medication to a patient, Salvana wrote a memorandum detailing his version of the events. (Dkt. No. 98-2, ¶¶ 63–70). Plaintiff contends that in response to his report, Henderson locked him out of the facility and demanded he go to her office. (*Id.* ¶ 71). In her office, Plaintiff alleges that she berated him for using an MWAP medication and filing a complaint about her. (*Id.* ¶ 72). Defendants deny the lock-out allegations and Plaintiff's characterization of the meeting. (*Id.* ¶¶ 71–72). According to Defendants, Mohawk Superintendent John C. Harper (who had replaced Gonyea) requested a meeting with Henderson and Salvana, where he raised

10

concerns that Salvana had been behaving disrespectfully towards Henderson. (Dkt. No. 92-8, ¶¶ 101–02). According to Defendants, Plaintiff subsequently chose to go to his vehicle to reflect on his conduct. (*Id.* ¶ 104). Defendants state that Plaintiff was not locked out of the facility and returned to Walsh RMU later that day to continue with his work duties. (*Id.* ¶¶ 105–08).

Plaintiff further alleges that Henderson and Nurse Director Betty Parkmond ordered nurses to withhold assistance from him for several of his patients. (Dkt. No. 98-2, ¶ 74). Plaintiff contends that the nurses complied with those orders and that he documented these events in a September 30, 2019 letter. (*Id.*). Defendants deny these allegations, and instead claim that Parkmond gave specific instructions to the nursing staff, following an incident, not to assist Plaintiff "in allowing incarcerated individuals to use sharps or needles, or to administer their own medication intravenously" for the purposes of "preventing nursing staff from violating clear directives and policy prohibiting such conduct." (Dkt. No. 92-8, ¶¶ 148–59). Defendants allege that Parkmond did not otherwise direct any nursing staff to withhold assistance from Plaintiff with any otherwise appropriate task. (*Id.* ¶ 160).

### E.  Plaintiff's Departure from Walsh RMU

On or about September 2019, Defendants contend that Plaintiff, on his own accord, contacted Dinello asking for assistance in transferring out of Walsh RMU to another facility. (*Id.* ¶ 166, Dkt. No. 98-2, ¶ 79). Plaintiff contends, however, that he was "removed and forced to leave Walsh RMU" to "escape an environment that needlessly prolonged patient suffering and retaliated against him for trying to prevent it." (Dkt. No. 94, ¶ 79). Plaintiff refers to an email Dinello sent to John Morley, the then Deputy Commissioner and Chief Medical Officer for DOCCS, about a year after the transfer stating that "Dr. Salvana was 'removed' from the Walsh RMU." (*Id.* ¶ 80, Dkt. No. 93-23, at 2; Dkt. No. 92-8, ¶ 3).

11

Dinello arranged for Plaintiff to obtain a physician position at Five Points Correctional

Facility, in Romulus, New York, which Plaintiff opted not to accept. (Dkt. No. 92-8, ¶¶ 169–70).

Dinello then assisted Plaintiff in obtaining a part-time physician position at Southport

Correctional Facility, in Southport, New York, a facility which was over two hours away from

Plaintiff's home. (*Id.* ¶ 171; Dkt. No. 94, ¶ 82). According to Defendants, Plaintiff chose to

accept the position, (Dkt. No. 92-8, ¶ 172), but according to Plaintiff, he was "forced" to take the

position. (Dkt. No. 94, ¶ 82).

After his transfer to Southport, Plaintiff subsequently contacted Dinello and Morley about

his interest in a Clinical Physician position at Cayuga Correctional Facility that would be open

upon the expected retirement of a physician employed at that facility. (Dkt. No. 92-8, ¶¶ 191,

202). Plaintiff completed and filed the necessary paperwork seeking the transfer. (Dkt. No. 94, ¶

84). Defendants contend that Dinello supported Plaintiff's decision, but made no promises as to

whether a physician position would be made available to him. (Dkt. No. 92-8, ¶¶ 192–93).

According to Defendants, upon the retirement of the Cayuga physician, the medical staff at

Cayuga voiced their preference that the position be switched to a nurse practitioner position to

allow a nurse practitioner then employed at Cayuga part-time to work at the facility full-time.

(*Id.* ¶ 196). Defendants contend that Dinello did not see a reason to overrule the preference

expressed by the medical staff at Cayuga, and so he did not object and instead notified Plaintiff

of the change. (*Id.* ¶¶ 197–98). Defendants contend that Morley deferred to Cayuga facility

administrators and Dinello about converting the position, and approved the position change

based on the facility's request. (*Id.* ¶¶ 204, 206–08). According to Defendants, because there was

no longer an open physician position, Plaintiff was not eligible to transfer. (*Id.* ¶ 206).

Plaintiff contends, on the other hand, that Dinello, Henderson, and Morley conspired to prevent his transfer by deliberately changing the position from a physician to a nurse practitioner, that Dinello had the authority to transfer him, and that there was an open physician position from the time the physician retired in February 2020 until another doctor was hired because the new nurse practitioner position did not result in the replacement of a physician. (Dkt. No. 99-1, ¶¶ 192–201; Dkt. No. 94, ¶ 89). In support of Plaintiff's contentions, Plaintiff cites to a statement Dinello made in his deposition that "I could've gotten him that job if he really wanted, if it was a good fit." (Dkt. No. 99-1, ¶ 197 (quoting Dkt. No. 93-11, at 272)). Plaintiff further offers that Dinello sent an email to the Cayuga Superintendent stating:

> I have a Physician by the name of Michael Salvana MD who would like to take over [the] Clinical Physician 2 position . . . Unfortunately there have been a few issues with his employment . . . I would actually like to change [the] Full Time Clinical Physician 2 Item into a Family or Adult [Nurse Practitioner] Item. . . . If we Post the Clinical Physician 2 Item, Dr. Salvana will ask to transfer into the Position and I don't believe we will find a local Physician willing to take the position. I think it would be best to just change the Item.

(Dkt. No. 94, ¶ 90; Dkt. No. 93-30, at 2–3).

Plaintiff alleges that his four-hour per day commute to Southport was untenable, and so he was "forced to resign," which according to Plaintiff, meant that "Dr. Dinello successfully forced him out of DOCCS." (Dkt. No. 94, ¶¶ 91–92). Plaintiff retired from state service in April 2020 because there was no viable physician position available. (*Id.* ¶ 93). A physician was hired at Cayuga in October 2020. (*Id.* ¶ 94).

## III.    THE MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A

fact is material if it "might affect the outcome of the suit under the governing law," and is

genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

Where, as here, both parties have filed motions for summary judgment, "the court must

evaluate each party's motion on its own merits." *Heublein, Inc. v. United States*, 996 F.2d 1455,

1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d

Cir. 1981)). The moving party bears the initial burden of demonstrating "the absence of a

genuine issue of material fact." *Celotex*, 477 U.S. at 323. The moving party may meet this

burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d

253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving

party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict

in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec.

Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving

party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477

U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d

Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve

disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v.*

*Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B. Discussion

#### 1. First Amendment Retaliation

To establish First Amendment retaliation, "the plaintiff must demonstrate that '(1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech.'" *Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020) (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018)). Both parties argue that summary judgment is warranted on the question of whether Plaintiff engaged in speech protected under the First Amendment. (Dkt. No. 92-9, at 7–10; Dkt. No. 93-34, at 11–16).

### a.    Protected Speech

"The speech of a public employee is protected by the First Amendment when the

employee speaks as a citizen on a matter of public concern, rather than pursuant to his

employment responsibilities." *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021)

(citing *Garcetti v. Ceballos*, 547 U.S. 410, 420–21 (2006)). Thus, as a public employee, Plaintiff

must demonstrate that he "engaged in citizen speech," in other words, that he "spoke as a private

citizen," and that "the speech at issue was on a matter of public concern." *See Montero*, 890 F.3d

at 399; *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

### i.    Matter of Public Concern

"Whether speech is on a matter of public concern presents a question of law that takes

into consideration the content, form, and context of a given statement." *Specht*, 15 F.4th at 600

(citing *Montero*, 890 F.3d at 399). "Speech deals with matters of public concern when it can be

fairly considered as relating to matters of political, social, or general interest to the community or

value and concern to the public." *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). As the

Second Circuit has explained:

> To identify matters of public concern, "we consider the motive of
> the speaker, cognizant that speech on a purely private matter does
> not pertain to a matter of public concern and, conversely, that an
> individual motivated by a personal grievance can simultaneously
> speak on a matter affecting the public at large[.]"

*Id.* (quoting *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)).

Defendants seemingly argue that Plaintiff's speech was not made on a matter of public

concern, because his statements were matters only of personal interest relating to internal

policies and should be viewed as personal employee grievances. (Dkt. No. 92-9, at 7).

Defendants assert that Plaintiff's complaints "focused on the fact that Plaintiff thought it was

demeaning to him professionally that he was required to seek approval from Dinello for the use

16

of MWAP medications and that he disagreed with Dinello's denials." (Dkt. No. 92-8, ¶ 72).

Plaintiff argues that his speech was on a matter of public concern, because it pertained to patient

suffering, the standard of care, and potential litigation and ethics complaints. (Dkt. No. 99, at

11). The Court agrees.

Although some of Salvana's complaints included statements describing the demeaning

effects of the MWAP policy as implemented by Defendant Dinello, (Dkt. No. 93-4, at 48–49,

55), Plaintiff's speech clearly extended beyond personal grievances and interests to focus on

patient care. Speech implicating "the health, welfare and safety of severely disabled individuals

in the care of the state[ ] are matters of importance to the public." *McLaughlin v. Pezzolla*, No.

06-cv-376, 2010 WL 56051, at *9, 2010 U.S. Dist. LEXIS 232, at *30 (N.D.N.Y. Jan. 4, 2010).

Here, Plaintiff's speech about the health of inmates in the care of the state who had some of the

"most complicated and difficult [medical] cases" was a matter of public concern. (Dkt. No. 94, ¶

11); *see Dillon v. Suffolk County Dep't of Health Servs.*, 917 F. Supp. 2d 196, 208 (E.D.N.Y.

2013) (finding complaints by a doctor at a correctional facility that *inter alia* necessary

medications were not being prescribed to be matters of importance to the public because they

implicated the health, welfare and safety of individuals in the care of the state). Plaintiff's

"concern for his patients' well-being and for the general workings of the [Walsh RMU]" based

on his "concern as a professional" was therefore a matter of public concern. *DiMarco v. Rome

Hosp.*, No. 88-cv-1258, 1991 WL 336000, at *1, 8, 1991 U.S. Dist. LEXIS 16603, at *3, 24–25

(N.D.N.Y. June 29, 1991) (finding complaints raising "questions about . . . the professional

conduct and medical judgment of several of his colleagues and the nursing staff, the Hospital's

overall patterns and practices, and the leadership and competence of those individuals who were

responsible for managing the Hospital" to be matters of public concern).

### ii.    Speaking as a Private Citizen

When determining whether a public employee spoke as a private citizen, courts ask two questions: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" *Matthews*, 779 F.3d at 173 (citing *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203–04 (2d Cir. 2010)). Within this inquiry, "[a]lthough the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, '[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" *Montero*, 890 F.3d at 397–98 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). Defendants argue that Plaintiff's speech fell squarely within his official responsibilities and that he has failed to allege a civilian analogue. (Dkt. No. 92-9, at 8). Plaintiff, on the other hand, argues that he was speaking as a private citizen. (Dkt. No. 93-34, at 15).

### (i) Official Responsibilities

Courts have adopted a "functional approach" to assessing whether speech falls outside of an employee's official responsibilities, focusing on the employee's "actual, functional job responsibilities." See *Matthews*, 779 F.3d at 173–74. Because of the fact-intensive nature of this inquiry, it is not subject to a bright-line rule: courts look to "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* at 173 (quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012)). Under this functional approach, formal job descriptions are relevant but not dispositive, because:

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

18

*Garcetti*, 547 U.S. at 424–25. In addition to a plaintiff's job description, courts have considered "the persons to whom the speech was directed," "whether the speech resulted from special knowledge gained through the plaintiff's employment," "whether the speech occurs in the workplace"; and "whether the speech concerns the subject matter of the employee's job." *Frisenda v. Inc. Vill. Of Malverne*, 775 F. Supp. 2d 486, 506 (E.D.N.Y. 2011) (citation omitted).

Here, the parties dispute Plaintiff's official duties. Henderson provided a declaration stating that Plaintiff was charged with, *inter alia*, "the coordination and direction of treatment at Walsh RMU; the provision and supervision of treatment to incarcerated individuals under the care of the Walsh RMU; the review of program standards and objectives to determine their appropriateness; and the general development, implementation and administration of services at the Walsh RMU." (Dkt. No. 92-1, ¶ 13). She further stated that "[i]t was within the responsibilities of his official position to weigh in on all aspects of provision of treatment to his patients, which included comments or concerns raised by implementation of policies by DOCCS medical staff." (*Id.* ¶ 14). In Plaintiff's 2018 and 2019 evaluations, Henderson "encouraged [Plaintiff] to continue evaluating and discussing medical care with his superiors" and praised his "initiative to advocate for health services staff and Walsh RMU admitted inmate-patients." (Dkt. No. 98-2, ¶ 20; Dkt. No. 93-4, at 35, 40). In his declaration Dinello stated that "[a]lthough [Plaintiff] was not technically charged with the creation and review of policy, he, as well as other medical directors, was encouraged and, indeed, expected to comment on or raise to administrators issues affecting patient care, including policies and procedures." (Dkt. No. 92-3, ¶ 34).

Plaintiff, however, denies that it was part of his duties "to comment or raise concerns about the implementation of DOCCS' policies" and refers the Court to his Description of

Activities and Tasks under the Title Clinical Physician 3 for a list of official duties. (Dkt. No. 99-1, ¶¶ 65–67). Under this description, prepared by Plaintiff's supervisor, twenty-five percent of his time was spent "[e]nsur[ing] high quality inmate health care by evaluating and discussing the medical care provided . . ." (Dkt. 93-32, at 2). His remaining responsibilities were (2) "[m]aintains professional relationships within the facility and outside in the community," (3) "[a]rranges on-call coverage," (4) "[e]ncourages staff growth through the promotion of in-service education," (5) "[e]valuates employee performance," (6) "[c]ompletes grievances and inmate correspondence investigations and submits appropriate documentation in a timely manner," and (7) "[e]valuate eligibility of inmates for medical parole and Full Board Case Review." (*Id.*). In Plaintiff's deposition, he testified that his primary job duties were to evaluate and supervise the other doctors and nurse practitioners. (Dkt. No. 93-2, at 72). He also testified that although the prior Medical Director did not take patients, Plaintiff decided to do so and managed the care of the twenty or thirty sickest patients. (*Id.* at 73).

In any event, courts are to use a "functional approach" in evaluating an employee's job duties. *Matthews*, 779 F.3d at 173; *Weintraub*, 593 F.3d at 203. The Second Circuit has held that speech is pursuant to a public employee's official job duties "even though it is not required by, or included in, the employee's job description" if the speech is "part-and-parcel of his concerns" about his ability to "properly execute his duties." *Weintraub*, 593 F.3d at 203 (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)) (finding that the public-school teacher's concerns about maintaining classroom discipline, an "indispensable prerequisite to effective teaching," were "part-and-parcel of his concerns" about his ability to "properly execute his duties" and were therefore, unprotected). In *Matthews*, the Second Circuit held that a police officer's complaints to precinct commanding officers about a precinct-wide quota system were

20

not "'part-and-parcel' of his regular job," and were therefore protected. 779 F.3d at 174. There,

the court found that the officer's duties did not involve formulating, implementing, or providing

feedback on the policy, because such policy-oriented speech was "neither part of his job

description nor part of the practical reality of his everyday work"; his job did not involve

reporting misconduct or commenting on precinct-wide policy, and he had "no role in setting

policy" nor was he "expected to speak on policy" or "consulted on formulating policy." *Id.* The

Second Circuit subsequently reaffirmed that "[u]ltimately, the question, then is whether the

employee's speech was 'part-and-parcel of [that person's] concerns about his ability to execute

his duties.'" *Montero*, 890 F.3d at 398 (quoting *Weintraub*, 593 F.3d at 203) (second alteration in

original). In *Montero*, the court found that a police officer's complaints at union meetings

qualified as citizen speech because they were made pursuant to the plaintiff's union role and not

"as a 'means to fulfill' or 'undertaken in the course of performing' his responsibilities as a police

officer." *Id.* at 398–99 (quoting *Weintraub*, 593 F.3d at 203).

Here, the Court finds that like *Weintraub*, Plaintiff's concerns about the MWAP Policy

were "part-and-parcel of his concerns" about his ability to properly execute his duties as Medical

Director, and that Plaintiff's concerns about the policy's implementation were indispensable to

his core duty of "[e]nsur[ing] high quality inmate health care." *See* 593 F.3d at 203; (Dkt. No.

93-32, at 2). His complaints were "means to fulfill" this duty and undertaken in the course of

performing his responsibilities. *Weintraub*, 593 F.3d at 203. Although Plaintiff argues that the

policy "had no impact on [his] core job functions" and that he was nevertheless able to "fulfill

his job duties of evaluating and treating patients," (Dkt. No. 93-34, at 15), it is well-documented

that the policy had significant impacts on Plaintiff's ability to treat patients as he saw fit, (*see,

e.g.*, Dkt. No. 94, ¶¶ 62–73). That Plaintiff's communications or concerns with the MWAP

Policy were part and parcel of his ability to do his job is also supported by the fact that "[a] few"

other providers raised similar communications or concerns. (Dkt. No. 93-11, at 202).

Thus, while Plaintiff's job description did not include formulating, implementing, or

providing feedback on DOCCS policies, here unlike in *Matthews*, Plaintiff's speech concerned a

policy that interfered with his ability to do his job – i.e. to provide quality patient care, and

following Plaintiff's complaints, DOCCS officials responded to and were engaged in considering

the policy's impact on patient care. Plaintiff's involvement in policy was evidenced by the

compromise reached by Plaintiff and Dinello after the January 2018 conference with respect to

MWAP implementation at Walsh RMU. (Dkt. No. 92-8, ¶¶ 98–99). Furthermore, Plaintiff's

speech was only made internally within DOCCS, was sent through DOCCS platforms, and raised

issues that Plaintiff only came to learn as part of his duties and responsibilities as Medical

Director. *See Frisenda*, 775 F. Supp. 2d at 506–07 (finding that these factors, among others,

rendered the plaintiff's speech unprotected).

That Plaintiff complained to higher levels of supervision beyond his direct supervisor

does not alter the analysis: his complaints stayed within the chain-of-command, and were sent to

those responsible for ultimately ensuring that incarcerated individuals in DOCCS custody

received proper medical care. *See id.* at 508–09. The fact that Henderson admonished Plaintiff

regarding his October letter to Koenigsmann, (Dkt. No. 92-2, at 9), and Gonyea apologized to

Koenigsmann about Plaintiff's letter, (Dkt. No. 92-4, at 24), does not change the Court's view

that Plaintiff was speaking as part of his public job and not as a citizen. Plaintiff sent his first

documented complaint, on July 7, 2017, to Koenigsmann, and Koenigsmann responded directly

to Plaintiff. (Dkt. No. 93-19, at 2). The fact that Plaintiff's supervisor at Mohawk directed

Plaintiff not to speak directly with Koenigsmann after Superintendent Gonyea himself got

actively involved by raising Plaintiff's complaint to the level of an Associate Commissioner of DOCCS does not change the fact that Plaintiff's complaints were part-and-parcel of his concerns about his ability to properly do his job. Plaintiff sent the October letter to Koenigsmann before the planned visit and Koenigsmann and Dinello met with Plaintiff shortly thereafter at an official site visit to have "a general discussion regarding the MWAP policy." (Dkt. No. 93-4, at 54).Thus, while breaking the chain-of-command may, in some instances, evince that a plaintiff is not speaking pursuant to his duties, *see Pisano v. Mancone*, No. 08-cv-1045, 2011 WL 1097554, at *11, 2011 U.S. Dist. LEXIS 28864, at *37 (S.D.N.Y. Mar. 18, 2011), it does not do so here, where Plaintiff had been and continued to be engaged in communications with Koenigsmann regarding the MWAP policy. *Cf. Gusler v. City of Long Beach*, No. 10-cv-2077, 2016 WL 11493644, at *19, 2016 U.S. Dist. LEXIS 206864, at *56 (E.D.N.Y. Aug. 4, 2016) (finding that plaintiff, at least theoretically, spoke as a citizen when he had been instructed not to comment on matters of policy or misconduct by his superiors and commented anyway).

### (i) Civilian Analogue

"Speech has a 'relevant civilian analogue' if it is made through 'channels available to citizens generally.'" *Matthews*, 779 F.3d at 175 (quoting *Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011)). In *Matthews*, the Second Circuit found that a police officer's speech had a civilian analogue when, rather than going through formal internal grievance procedures, he "went directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints." *Id.* at 176. The Court noted that these Precinct commanders attended monthly Community Council meetings, met with members of the community, and "regularly heard civilian complaints about Precinct policing issues." *Id.*; *see also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 509–10 (S.D.N.Y. 2015) (finding

on summary judgment that an NYPD officer's speech had a civilian analogue when he spoke at a performance evaluation and appeal meeting, but also with the Internal Affairs Bureau and Quality Assurance Division, noting that any citizen can report wrongdoing to the IAB, and that it was not clear from the record whether the public can report to the QAD, which would "remain a question for trial"); *cf. Weintraub*, 593 F.3d at 204 (finding a teacher's speech was not protected when he lodged a union grievance, which is not a channel available to non-employees).

Here, Plaintiff emailed, wrote letters to, and met with various DOCCS officials, including Superintendent Gonyea, RMD Dinello, and Chief Medical Officer Koenigsmann. (Dkt. No. 94, ¶¶ 47–50, 54). The record is devoid of any evidence of whether members of the public could engage in these methods of communications with DOCCS officials, but Gonyea, Dinello and Koenigsmann were within Plaintiff's chain of command. (*Id.* ¶¶ 25 (explaining that Dr. Dinello was Plaintiff's immediate supervisor), 26 (explaining that Dr. Dinello reported directly to the CMO); Dkt. No. 92-8, ¶ 18 (explaining that Plaintiff also reported to administrators at Mohawk, including Gonyea as the facility superintendent)). Plaintiff asserts that citizens could write to and have conversations with DOCCS officials, (Dkt. No. 93-34 at 15 n.9), but there is no evidence that these officials consider complaints from private citizens. Plaintiff also cites to the DOCCS' grievance procedures for incarcerated individuals, (*id.*),[7] but complaints submitted though the grievance process lack a relevant civilian analogue as they are "internal communication[s] pursuant to an existing dispute-resolution policy" and are therefore not made "through channels available to citizens generally." *Weintraub*, 593 F.3d at 204 (finding that the plaintiff's union grievance filing lacked a relevant civilian analogue).

---

[7] In his reply brief, Plaintiff cites to Paragraph 32 of his Statement of Material Facts, (Dkt. No. 99, at 12), which sets forth the DOCCS grievance process and cites to DOCCS Directive No. 4040, (Dkt. No. 94, ¶ 32 & n.41). DOCCS Directive 4040 is entitled "Incarcerated Grievance Program" and its purpose is to resolve grievances by incarcerated individuals. (Dkt. No. 93-16).

Without evidence that these officials took public concerns and given that they were within Plaintiff's chain of command, the Court finds that there is no civilian analogue for Plaintiff's speech. *See Ross*, 693 F.3d at 307 ("Taking a complaint up the chain of command to find someone who will take it seriously 'does not, without more, transform [his] speech into protected speech made as a private citizen.'" (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011))); *Calvelos v. City of New York*, No. 19-cv-6629, 2020 WL 3414886, at *14, 2020 U.S. Dist. LEXIS 109266, at *40 (S.D.N.Y. June 22, 2020) (finding that "intra-facility complaints to the command staff" by a corrections officer lacked a civilian analogue); *Flynn v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 17-cv-2864, 2018 WL 2041713, at *6, 2018 U.S. Dist. LEXIS 72277, at *15–16 (S.D.N.Y. Apr. 30, 2018) (rejecting plaintiff's argument that her complaints were "outside the chain of command" because the official she complained to was "several levels above [her] at DOCCS," because the official did not "entertain[] complaints from private citizens"). Although "the lack of a civilian analogue [i]s not critical to a decision as to whether [Plaintiff] spoke as a private citizen," it supports the Court's finding that the speech at issue was within the scope of Plaintiff's duties. *See Montero*, 890 F.3d at 398.

Therefore, after carefully considering all of the evidence, the Court finds that the Plaintiff was speaking as a public employee, and not a citizen. Accordingly, "no First Amendment claim arises, and that ends the matter." *Caraccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008).[8] Thus, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment.

---

[8] Accordingly, the Court does not evaluate the parties' arguments about whether Plaintiff suffered an adverse employment action causally related to his speech, nor does the Court consider Defendants' arguments regarding the statute of limitations, appropriateness of injunctive or prospective relief, or qualified immunity.

**IV.    CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 93) is **DENIED**;

and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 92) is

**GRANTED** and Plaintiff's amended complaint (Dkt. No. 38) is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>March 6, 2025</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

26

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL F. SALVANA, M.D.,

                          Plaintiffs,

        -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, CARL KOENIGSMANN,
M.D., JOHN MORLEY, M.D., DAVID S.
DINELLO, M.D., PATRICIA HENDERSON,
R.N., and BETTY M. PARKMOND, R.N.,

                          Defendants.

**Notice of Appeal**

**5:21-cv-00735
(BKS/ML)**

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that plaintiff hereby appeals to the United States Court of Appeals for the Second Circuit, from each and every part of the Memorandum Decision and Order and Judgment in this action dated and entered March 6, 2025 which denied Plaintiffs' Motion for Summary Judgment and Dismissed the Case.

Dated: March 21, 2025
      Albany, New York

COOPER ERVING & SAVAGE, LLP

By:                         

            Carlo A. C. de Oliveira
            Attorneys for Plaintiff
            20 Corporate Woods Blvd.
            Albany, NY 12207
            (518)449-3900

Addendum B

## List of Issues To Be Raised on Appeal

1.  Did the District Court err to dismiss Dr. Salvana's Equal Protection claim as duplicative of his First Amendment Claim at the motion to dismiss stage?

2.  Did the District Court err to dismiss Plaintiff's claims against the New York State Department of Corrections and Community Supervision ("DOCCS") on sovereign immunity grounds where reinstatement was a prospective relief available?

3.  Was Dr. Salvana's speech protected notwithstanding *Garcetti v. Ceballos* because his objections to DOCCS' policy was not part and parcel of his everyday job duties?

4.  Did the District Court err in relying on *Weintraub v. Bd. Of Educ. Of City School Dist. of City of N.Y.* to dismiss a Dr. Salvana's First Amendment claim on the grounds that it was related to his job duties as a physician?